No. 37,034

CITIZENS STATE BANK OF DALHART, *Appellant*, v. FARMERS UNION LIVESTOCK COOPERATIVE COMPANY, *Appellee*.

(193 P. 2d 636)

Opinion filed May 8, 1948.

*Daniel M. Moyer*, of Wichita, argued the cause, and *Chas. G. Yankey, Harvey C. Osborne, John G. Sears, Jr.,* and *Dwight S. Wallace,* all of Wichita, were with him on the briefs for the appellant.

*Paul R. Kitch,* of Wichita, and *C. G. Myers,* of Chicago, Ill., argued the cause, and *Howard T. Fleeson, Homer V. Gooing,* and *Wayne Coulson,* all of Wichita, were with them on the briefs for the appellee; *C. F. Snerly,* of Chicago, Ill., of counsel.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for the alleged wrongful conversion of mortgaged cattle. The appeal is from an order overruling plaintiff's demurrer to portions of defendant's answer.

In plaintiff's petition it was alleged (1) that plaintiff is a banking corporation organized and existing under the laws of Texas, with its place of business and post-office address at Dalhart, Tex.; (2) that defendant is a corporation organized under the laws of Missouri and authorized to do business in Kansas and has its principal place of business and registered office at Wichita; (3) that on July 26, 1945, plaintiff extended a loan to one J. E. Jones in the amount of $9,888.88, evidenced by a note of that date due December 1, 1945; that to secure the note J. E. Jones, a single man and a nonresident of Kansas, executed his chattel mortgage on 215 head of cattle, "now located and situated in the county of Meade, state of Kansas," being 80 head of steers, yearlings and two-year olds; 45 cows, four to eight years old, and 60 calves by their sides, being the same cattle purchased from Ray Barr; that the steers were branded "C" on the right hip, the cows and calves were branded "V" on the left shoulder or "C" on the left hip, and the mortgage stipulated that it was given to secure the payment of the note, which represented the purchase price of the cattle. The mortgage contained the condition, among others,

"That so long as the possession of said property is permitted to remain with mortgagor the same shall not be sold, mortgaged or removed from the place above named without the written consent of the bank."

It was further alleged that about October 8, 1945, defendant purchased from J. E. Jones approximately 208 head of the cattle covered by the chattel mortgage, and that at a later date, unknown to plaintiff, defendant sold the cattle to persons, firms or corporations, the names of which were unknown to plaintiff, and paid J. E. Jones, the sum of $10,727 for the cattle it purchased, which was their fair and reasonable value; that the cattle were clearly branded and easily identified as cattle covered by the mortgage; that the cattle were sold by Jones to defendant and were resold by defendant without the knowledge or consent of plaintiff; that due and proper de-

mand has been made upon defendant for the payment to plaintiff by defendant of the loss sustained by plaintiff by reason of the unlawful sale of the cattle covered by plaintiff's mortgage, and that defendant has failed and neglected to pay the same, by reason of which fact defendant is indebted to plaintiff in the amount of the note with interest. The chattel mortgage was duly filed for record in the office of the register of deeds of Meade county, Kansas, on August 4, 1945, at 9:20 o'clock a. m.

Defendant filed an answer in which it admitted the allegations of paragraphs 1 and 2 of plaintiff's petition and generally denied each and other allegations in plaintiff's petition. Defendant further alleged (paragraph 4) that if the note and mortgage were executed and recorded with the register of deeds in Meade county, Kansas, as alleged in plaintiff's petition, such instruments were void insofar as the rights of an innocent third person, not a party thereto, are concerned, and as to such innocent third party the alleged registration would not impart constructive notice of their existence for one or several of the following reasons (set out in subparagraphs a to d.). We copy the portion of the answer to which the demurrer was directed:

"(c) That at the time said mortgages were purported to have been executed and acknowledged, the cattle and live stock purported to be described therein were not within the State of Kansas and were not within Meade County, Kansas, or at the place at which they were purported to be described therein.

"(d) That in said purported mortgages the plaintiff attempts to describe and identify the live stock by brands and that the brands used to describe said live stock were not owned by or recorded in the name of the plaintiff or the said J. E. Jones with the proper officials of the State of Kansas, and that neither the plaintiff nor the said J. E. Jones owned said brands or had the lawful right in any way to use said brands upon live stock or to use said brands in the description of live stock, and that neither the plaintiff nor the said J. E. Jones was the recorded owner of said brands or otherwise had lawful right to use said brands in the State of Kansas. (Amended by adding):

"At the time said mortgage was executed the brands referred to therein had not been placed on said cattle but such brands as were later placed on said cattle were placed there at the direction of the plaintiff in Meade County, Kansas."

The answer continues:

"Further answering plaintiff's petition, this defendant alleges and states that the Union Stock Yards located at Wichita, Kansas, is a stockyards as defined by Title III of the Packers and Stockyards Act of 1921 as amended, and which is Section 202, Title 7 U. S. C. A. and Section 42 of Statutes 163.

"That the defendant, Farmers Union Livestock Coöperative Company is a market agency, buying and selling live stock on commission at the said Union

Stock Yards, Wichita, Kansas, and registered with and licensed by the Secretary of Agriculture of the United States of America, to engage in such business as a market agency at said Union Stock Yards, Wichita, Kansas, in buying and selling live stock on commission pursuant to the terms and conditions of said Packers and Stockyards Act of 1921 as amended and the lawful rules and regulations of the Secretary of Agriculture.

"That this defendant in the conduct of its said business as a market agency at the Union Stock Yards, Wichita, Kansas, as aforesaid, is required to receive and sell, without discrimination, all live stock consigned and shipped to it for sale at the said Union Stock Yards, Wichita, Kansas, and which live stock has been raised, conditioned, produced and shipped from a large number of different states of the Union; that this defendant is required to serve all applying for its services, without discrimination, and at rates and charges determined, fixed and approved by the Secretary of Agriculture of the United States of America, pursuant to the said Packers and Stockyards Act; that this defendant can no longer select those whom it will serve and those whom it will not serve, but is required to serve all those applying for its services.

"That if at any time this defendant as a market agency received and sold any live stock shipped and consigned to it for sale by J. E. Jones, and if the plaintiff had any interest in any such live stock, which this defendant denies, that this defendant received and sold said live stock acting as a market agency, without notice or knowledge of any kind that the plaintiff claimed any right or interest in said live stock, or any knowledge that anyone had an interest in said live stock other than the shipper and consignor, J. E. Jones; that the defendant, Farmers Union Livestock Coöperative Company, performed its duties as required by the Packers and Stockyards Act, the lawful rules of the Secretary of Agriculture, and immediately accounted to the shipper and consignor, the said J. E. Jones, for the full amount of the net proceeds of said live stock, and that this defendant never knew or had any knowledge whatsoever that the plaintiff claimed any interest in any of such live stock until long after it had received and sold said live stock and remitted and accounted to the shipper, J. E. Jones, for the proceeds, and until long after the said J. E. Jones received said proceeds from any such sale or sales which might have been made."

The prayer was that plaintiff's petition be dismissed at its costs. The demurrer was considered by the court and overruled.

We think the demurrer should have been sustained to paragraph 4 (c). The fact that the cattle were not in Meade county, Kansas, at the time the mortgage was given is not material. The amendment added to paragraph 4 (d) discloses they were brought to Kansas, where the mortgage is alleged to have been recorded. On this point appellee relies strongly upon the portion of our statute (G. S. 1935, 58-301) which provides for the recording of chattel mortgages in this state in the county of the mortgagor's residence and also in the county where the mortgaged property is located, "but if the

mortgagor does not reside in this state then the mortgage shall be recorded in the county in which the mortgaged property is situated at the time the mortgage is executed." The legislature was dealing with the general subject of recording mortgages in Kansas; it was not attempting to deal with the subject of recording a chattel mortgage where the mortgagor and the property were both outside the state. When a mortgage is given to some one who is out of the state by a mortgagor residing out of the state, upon property situated without the state, it is a matter which our legislature could not act upon, and there is no reason to suggest that it was attempting to do so. If the mortgagor is a nonresident of the state, and the property mortgaged is situated in Kansas, the mortgage should be recorded in Kansas. In *Hess-Harrington, Inc., v. State Exchange Bank,* 155 Kan. 118, 123, 122 P. 2d 739, a resident of Jackson county, Missouri, executed a mortgage on a car which he had in that county to a mortgagee situated there. Later the mortgagor brought the car to Woodson county, Kansas, where acts took place which complicated the situation and raised the question of whether its mortgage was still a lien upon the property. The court said:

"It (the mortgagee) could have enforced its lien promptly when the property was removed from Missouri, it could have enforced it when default was made in the note, *or it could have filed its mortgage in Woodson county.*" (Emphasis ours.)

When the mortgagor and mortgagee are residents of another state and the property is situated there, and the mortgage duly recorded in that state, and the property is later brought into Kansas, without consent of the mortgagee, our courts recognize the lien of the mortgage upon the property, if the question is raised in this state, even though the mortgage is not recorded here. This is done under a rule of comity between states and not by reason of any statute. (*Handley v. Harris,* 48 Kan. 606, 29 Pac. 1145.) But even in such a case it is much safer for the mortgagee to file his mortgage in this state in the county to which the property has been removed (*Hess-Harrington, Inc., v. State Exchange Bank,* supra), and certainly it is more notice to people in Kansas dealing with the property. Counsel stress the wording of the statute (G. S. 1935, 58-301) that the mortgage "shall be forthwith deposited" in the office of the register of deeds, and also the wording in the latter part of the section, "in the county in which the mortgaged property is situated at the time the mortgage is executed." These phrases have received

a practical construction throughout the history of the state; that is to say, if the mortgage is not filed "forthwith" it does become a valid notice to subsequent purchasers, etc., if and when it is recorded. It is not such notice prior thereto, and where the location of the property is changed after the mortgage is given, and the mortgage recorded in the place to which the property has been moved and kept, it is valid from the time the mortgage is recorded in the county to which the property was moved. In this case it is sufficient that the cattle were in Meade county and branded as described in the mortgage, and that the mortgage was filed for record in that county, as alleged. Neither is it important that the cattle were not branded at the time the mortgage was executed if the brands described in the mortgage were later placed thereon. The result is that so far as anything alleged in paragraph 4 (c) of the answer, and including the amendment made to paragraph 4 (d), the mortgage was a valid lien upon the cattle and notice to subsequent purchasers, etc., at the time the cattle were sent to defendant and purchased by it. The following cases, which list is not designed to be complete, support these conclusions: *Golden v. Cockril,* 1 Kan. 259 [247]; *Denny v. Faulkner,* 22 Kan. 89, 98, 99; *Cameron, Hull & Co. v. Marvin,* 26 Kan. 612, 626, 628; *McVay v. English,* 30 Kan. 368, 1 Pac. 795; *Swiggett v. Dodson,* 38 Kan. 702, 17 Pac. 594; *Boot & Shoe Co. v. Ware,* 47 Kan. 483, 492, 28 Pac. 159; *Dry Goods Co. v. McKee,* 51 Kan. 704, 33 Pac. 594; *Brittain v. Blanchard,* 60 Kan. 263, 56 Pac. 474; *Geiser v. Murray,* 84 Kan. 450, 453, 455, 114 Pac. 1046; *Overland Co. v. Evans,* 104 Kan. 632, 634, 635, 180 Pac. 235; *Peoples Nat'l Bank v. Edmunds,* 119 Kan. 212, 216, 237 Pac. 911; *Farmers State Bank v. Peters,* 137 Kan. 786, 22 P. 2d 457; *Schmitz v. Stockman,* 151 Kan. 891 (syl. 5), 101 P. 2d 962.

We think the demurrer to paragraph 4 (d) of the answer should have been sustained. That pertains to our statute on marks and brands then in force. (G. S. 1945 Supp., ch. 47, art. 4.) This authorized the governor to appoint a state brand commissioner whose duty, among others, was to record all brands used for the branding or marking of livestock in Kansas. Under it any person may adopt a brand for the purpose of branding livestock and have the exclusive right to use it after recording it with the state brand commissioner, and the method of doing that is provided. Any brand recorded in compliance with the act is the property of the person causing it to be recorded and is subject to sale, etc., and no evi-

dence as to ownership of brands shall be recorded with the commissioner except in compliance with the act. By section 420 it is made unlawful for any person to use any brand for branding livestock unless the same shall have been duly recorded in the office of the brand commissioner. To do so is made a misdemeanor, punishable by a fine. This is not a prosecution under that section. We find nothing in the statute tending to show that one who brands livestock without having his brand recorded with the state brand commissioner loses title to the livestock, or that the failure of recording such a brand would invalidate a mortgage upon the livestock. The amendment added to this paragraph, which alleges the cattle were branded after the mortgage was given and while the cattle were in Meade county, Kansas, states no defense.

Shortly stated, the remainder of defendant's answer is to the effect that the Union Stockyards at Wichita is a stockyards defined by Title III of the Packers and Stockyards Act of 1921; that defendant "is a market agency, buying and selling livestock" on commission at such stockyards and registered with and licensed by the United States secretary of agriculture to engage in such business; that in the conduct of its business it is required to receive and sell without discrimination all livestock consigned and shipped to it for sale, and to serve all applying for its services without discrimination at rates and charges approved by the secretary of agriculture pursuant to the packers and stockyards act; that it cannot select those whom it will serve, but is required to serve all applying for its services; that at the time defendant received and sold any livestock shipped to it for sale by J. E. Jones, defendant received and sold the same acting as a market agency, and accounted to Jones the net proceeds without any notice or knowledge that plaintiff had any right or interest in the livestock, the ultimate contention on this point being that even though plaintiff's mortgage was duly recorded and valid in every respect; as a purchaser of such livestock, it was not bound by the constructive notice of the record of the mortgage as an individual purchaser would be, and since it had no actual knowledge of the mortgage its position as a market agency under the packers and stockyards act relieved it of any necessity of accounting to anyone except J. E. Jones, the shipper and consignor of the livestock to it. The contention cannot be sustained. It may be conceded that defendant is a market agency, as alleged, but it does not follow that defendant has to receive and sell all livestock shipped to it and pay

the shipper from the proceeds without making inquiry as to his lawful ownership of the livestock. The transaction is a change of title, and there is no reason why defendant should not be bound by our statute the same as any other purchaser of livestock unless there is something in the packers and stockyards act which relieves defendant from being so bound.

The packers and stockyards act was prompted by complaints of unfair business practices by the packers, by livestock commission men and others who handle the business of selling livestock at the largest stockyards in this country. The act was passed after extended hearings before congressional committees upon bills in earlier sessions of congress as well as upon the bill which became the law on August 15, 1921, which considered the complaints of stockmen and others respecting the complaint of unjust practices, together with previous actions in court respecting some of such practices, with the result that the bill when introduced gave the "secretary of agriculture complete inquisitorial, visitorial, supervisory, and regulatory power over the packers, stockyards and all activities connected therewith; . . . The secretary of agriculture is given jurisdiction over the packers, stockyards, commission men, traders, buyers, and sellers in the stockyards. . . . he is given the further power to prescribe the manner and form in which the packers, stockyards, and all other concerns operating in said yards, shall keep their books and accounts. He is given the power to prevent packers, stockyards, companies, and all persons dealing in the stockyards from engaging in unfair, unjustly discriminatory or deceptive practices or devices, . . . to regulate and prescribe the practices on the stockyards, to prevent abuses . . ." (See Report No. 77, 67th congress, first session, of the committee on agriculture, which submitted the bill.)

In *Stafford v. Wallace*, 258 U. S. 495, 66 L. Ed. 735, 42 S. Ct. 397, is presented a similar statement of the purposes of the act. It is there pointed out (p. 500) that the interest of "bank and cattle loan companies" were taken into account in the preparation of the act. The opinion also makes it clear that the purchase or sale of livestock by commission companies at the stockyards was a transfer of title to the livestock. It would be strange indeed if after all the hearings referred to in the report and the anxious efforts of congress through its committees to prepare an act to avoid abuses and practices detrimental to the owners of livestock so purchased and sold

by the market agencies at the stockyards, that congress would in effect nullify the statutes of Kansas and other states with respect to the recording of chattel mortgages and the constructive notice that such valid mortgages so recorded should be rendered nugatory if the purchase is made by a market agency at a stockyards. Assuming the power of congress to do such a thing, certainly the act should have made it clear that such was one of its purposes. It is not claimed that the wording of the act makes such a result clear.

The act gives the secretary of agriculture, after investigation, the power to make appropriate rules for the conduct of the business of market agencies and others transacting business at the stockyards. Among the rules promulgated and in force at the time of the transactions here involved (see Code of Federal Regulation of the United States of America, Cumulative Supplement, Titles 4-9, pp. 2910-2925) is rule § 201.14 pertaining to the licensing of market agencies doing business at the stockyards. This required an applicant for such a license to make a showing of his financial ability to fulfill the obligations he would incur as a licensee, or to give a satisfactory surety bond, the terms of which are provided by rule § 201.29. Some of the bonds given in pursuance of this rule have been involved in litigation. (See *Oss v. Hartford Accident & Indemnity Co.*, 130 Neb. 311, 264 N. W. 897; *Hartford Accident & Indemnity Co. v. Morgan* [Ohio App.], 32 N. E. 2d 425.) The bonds contain the obligation, among others, for "the faithful and prompt accounting for and payment of the proceeds of sale of live stock received for sale by such market agency for or on account of the owner or consignor, and all agreements for the purchase and/or sale of live stock, together with all charges properly assessable against such live stock or arising in connection with or on account of the handling, purchase and/or sale thereof."

With respect to the proceeds of the sale rule § 201.39, so far as here pertinent, reads:

"No market agency or licensee shall pay the net proceeds . . . arising from the sale of livestock, . . . consigned to it for sale, to any person other than the owner of such livestock, . . . except upon an order from the Secretary of Agriculture or a court of competent jurisdiction, unless such person holds (a) a valid, unsatisfied mortgage or lien upon the particular livestock . . ."

This seems to make it clear that valid chattel mortgages on the livestock sold by a market agency are not to be ignored.

We see nothing in the statute which sustains defendant's allega-

tion to the effect that under the packers and stockyards act it is required to sell promptly all livestock shipped to it for sale and pay the shipper the full net price thereof after the judgments, commissions and other proper chargeable items, without making any inquiry into the ownership of the livestock. Indeed, we regard the contention as contrary to the statute and the rules of the secretary of agriculture promulgated thereunder. Unless the packers and stockyards act and the rules of the secretary of agriculture promulgated thereunder abrogate our statute (G. S. 1935, 58-301), which makes the proper recording of a valid chattel mortgage notice of the mortgage lien to subsequent purchasers, we see no legal reason to say it is not applicable to such a market agency.

The defendant's argument on this point is not predicated upon the packers and stockyards act, nor upon any rule promulgated thereunder by the secretary of agriculture. It is predicated upon the general theory that by the act stockyards are made "public utilities," and that the general law of public utilities, as applied to railroads and other public utilities, would relieve them of any duty to take any notice of the recorded chattel mortgage. The argument is far-fetched and lacks substance. The analogy of the relation of a common carrier of merchandise shipped on bills of lading to that of the defendant is not the same. The common carrier is a bailee of the merchandise; the defendant is a purchaser of it. When defendant purchased the livestock from Jones it became the owner of the cattle; the title passed.

We find no federal case passing specifically upon the question urged by defendant that the packers and stockyards act relieves it as a market agency from taking cognizance of valid mortgage liens upon the livestock purchased. The question has been before some of the state courts. In *Mason City P. C. Assn. v. Sig Ellingson & Co.*, 205 Minn. 537, 286 N. W. 713 (petition for certiorari, 308 U. S. 599, 84 L. Ed. 501, 60 S. Ct. 130, and motion for rehearing of the petition denied, 308 U. S. 637, 84 L. Ed. 529, 60 S. Ct. 178), the court had the specific question before it. That was a case involving a chattel mortgage on cattle purchased by the market agency. The pertinent syllabus reads:

"The Packers and Stockyards Act (42 St. 159, 7 USCA, §§ 181-229) *held* not intended to supersede or disturb state law respecting chattel mortgage security on livestock delivered at public stockyards."

In that case there was a thorough discussion of all the contentions made by the market agency which are renewed by defendant here.

This case was followed in *First Natl. Bank v. Siman*, 67 S. D. 118, 289 N. W. 416, where there was a chattel mortgage on sheep shipped to and sold to the market agency. It was followed also in *Moderie v. Schmidt*, 6 Wn. 2d 592, 108 P. 2d 331, where the market agency was held liable to the owner for having paid a drover from whom it received cattle the full purchase price thereof, though the market agency had no notice of his defective title.

In *Birmingham v. Rice Bros.* (Iowa), 26 N. W. 2d 39, where possession of cattle had been obtained by fraud and taken to a market agency, which purchased the same, the one from whom they were obtained by fraud recovered from the market agency as for conversion of the livestock. It was held (¶¶ 6 to 13 of annotation 26 N. W. 2d, *supra*):

"The requirements of Packers' and Stockyards Act as to furnishing services without discrimination substantially accord with common-law rule applicable to public utilities in general.

"Neither by common law nor by any statute is any public utility required to serve all, and conduct prohibited is unjust discrimination, unfair rates or practices or unreasonable rules.

"A market agency licensed under the Packers' and Stockyards Act may require some reasonable showing that each proposed transaction is legitimate, and is not required to handle stolen livestock or livestock to which the principal's title is defective, but may make reasonable requirements that one proposing to deal with it establish his identity and ownership of livestock.

"Refusal of a licensed market agency operating under the Packers' and Stockyards Act to aid a criminal in his crime of disposing of stolen or fraudulently acquired livestock is not wrongful 'discrimination' prohibited by the act Packers' and Stockyards Act of 1921.

"Request that factor licensed under the Packers' and Stockyards Act to dispose of property fraudulently procured or stolen is not a 'reasonable request' for stockyard services which factor must comply with or be guilty of violating the act.

"The Packers' and Stockyards Act does not relieve market agencies licensed thereunder from tort liability for wrongful conversion and thus abrogate legal rights of the general public under state laws.

"The construction placed upon Packers' and Stockyards Act by federal authorities charged with its administration, in support of whom Solicitor General appeared in United States Supreme Court, is entitled to weight.

"The Packers' and Stockyards Act did not absolve a factor, which was a licensed market agency operating under the Act, from common-law liability for conversion of third party's livestock through innocent participation in principal's fraud."

The Missouri Court of Appeals, in *Blackwell v. Laird and Laird*, 236 Mo. App. 1217, 163 S. W. 2d 91, held that a market agency under

the packers and stockyards act, on selling stolen cattle received from a shipper and remitting the proceeds of the sale to him, was not liable to the owner of the cattle where the market agency did not know the cattle had been stolen. This holding was predicated upon the view that the market agency, being a public utility, was compelled under the packers and stockyards act to receive and purchase all livestock shipped to it. We do not accord with that view. Inasmuch as the market agency has to account to the owner of the livestock, including any mortgagee of a valid mortgage thereon, we think it cannot be said that the market agency must pay the proceeds of the purchase price to the person who ships or brings the cattle to the agency without regard to his title or ownership of such livestock. The rule previously quoted from the Iowa decision harmonizes with our view.

It is not contended by defendant that it acted as the agent of J. E. Jones in the sale of the livestock. We mention this simply to point out that the question of agency is not involved. Under the authorities cited in the Iowa case such a contention would not have been beneficial to defendant.

We have no occasion here to write a thesis on the law of public utilities, but it may be said that the regulatory statutes pertaining to them are designed to have the business of the utility conducted fairly and without discrimination, but we think that none of them is designed to abrogate valid state laws for the protection of property rights. Even telegraph companies are not required to send obscene messages or those which obviously are sent for the purpose of aiding in the commission of crime (see 52 Am. Jur. 133, 136), and a railroad company which receives merchandise for shipment as a bailee may be liable if later it aids others in disposing of the property in a manner which amounts to conversion. (See *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.,* 120 Kan. 21, 121 Kan. 10, 245 Pac. 734), although liability was there denied because the action was not brought within the time provided by the bill of lading. We need not pursue this point. Whatever the relations of persons acting under the packers and stockyards act are to common carriers, both being public utilities, the duties and liabilities of those acting under the packers and stockyards act are governed by that act. (See *Swift & Co. v. United States,* 316 U. S. 216, 649, 86 L. Ed. 1391, 62 S. Ct. 948.)

We think the law pertaining to the notice given to subsequent

purchasers of valid chattel mortgages, duly recorded, is well stated in *Brown v. Campbell,* 44 Kan. 237, 24 Pac. 492, where the syllabus which tells the story sufficiently, reads:

"A chattel mortgage was properly deposited in the office of the register of deeds, and was valid, and the mortgage debt was not paid although it had been due for some time, and the mortgagee never had the actual possession of the property. The wife of the mortgagor transported the property to another county, consigned it to and placed it in the possession of à commission merchant or broker for sale, who sold and delivered the same to others and paid over the proceeds of the sale to the consignor, the wife of the mortgagor, and all this was done without the knowledge or· consent of the mortgagee, and without any actual knowledge on the part of the commission merchant or broker concerning the mortgage or the rights of the mortgagee. *Held,* That as the mortgage was properly on file in the office of the register of deeds, and valid, the commission merchant or broker was bound to take notice of the same and of the rights of the mortgagee, and that by selling and delivering the property to others he made himself liable to the mortgagee as for a conversion of the property."

The case on this point has been followed and relied upon in *Greer v. Newland,* 70 Kan. 310, 77 Pac. 98, although in that action the plaintiffs specifically waived the tort and relied upon the implied contract, the court holding that the rule as announced in *Brown v. Campbell,* supra, was applicable whether the action was brought in tort or on contract. Upon rehearing (70 Kan. 315, 78 Pac. 835) the court concluded it was mistaken in holding the rule announced in *Brown v. Campbell,* supra, applicable where the action was brought on contract where the tort had been waived. The court, however, did not overrule *Brown v. Campbell,* supra, but distinguished it. The rule of *Brown v. Campbell,* supra, later has been followed and relied upon in *Lumber and Grain Co. v. Eaves,* 114 Kan. 576, 581, 220 Pac. 512, and in *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.,* supra.

We have considered all the authorities cited by counsel, and while much more might be written we think what has been said sufficient. We conclude that the contention of defendant that because of its market agency under the packers and stockyards act it is relieved from giving attention to a valid recorded mortgage upon cattle shipped to and purchased by it is without merit, and that the demurrer filed by plaintiff to the parts of defendant's answer herein discussed should have been sustained.

The judgment of the trial court is reversed with directions to sustain the demurrer.

Hoch, J. (dissenting): Time presently available permits only a sketchy and incomplete statement of the reasons which impel me to dissent from this decision. The appeal being here from an order overruling plaintiff's demurrer to certain portions of the answer, and upon stipulation as to the issues thus raised, the essential facts are not in dispute.

Jones, a resident of Dallam county, Texas, gave a mortgage on cattle to a Dalhart, Tex., bank, the appellant here. The cattle were not then in Kansas, but subsequently were brought to Meade county, Kansas, branded, and the mortgage was there recorded on August 4, 1945. In October, 1945, the cattle were shipped by Jones to the Union Stock Yards at Wichita, consigned to the appellee for sale. The Wichita stockyards is regulated under the packers and stockyards act, hereinafter referred to as the act. The appellee is a market agency registered with and licensed by the secretary of agriculture, to operate on the Wichita stockyards in the buying and selling of livestock on commission, pursuant to the terms and conditions of the act. The cattle were received by the market agency, sold, and the net proceeds promptly forwarded to Jones, the shipper and consignor. The market agency had no notice or knowledge of the mortgage. It had no notice or knowledge that the plaintiff or anyone else other than the shipper and consignor had any interest in the livestock. Under the allegations of the answer, to which the demurrer was directed, the market agency is required by the act to receive and sell, without discrimination, all livestock consigned and shipped to it for sale, at rates and charges for such service, approved by the secretary of agriculture.

This decision holds that the market agency is liable to the mortgagee, under the facts stated, on the ground that the recording in Meade county gave it constructive notice of the mortgage. Furthermore, it is said in the opinion that if the cattle, while located in Texas, had been mortgaged and the mortgage there recorded where the mortgagor and mortgagee were residents, and the cattle had later been brought into this state, without the consent of the mortgagee, the mortgage lien would be here recognized even though the mortgage had not been recorded in Kansas, this being done under the rule of comity between the states (citing *Handley v. Harris*, 48 Kan. 606, 29 Pac. 1145).

The primary question here presented is whether the imposition of such a liability upon the market agency constitutes a valid

exercise of police power by the state, or whether it constitutes, under the law and the realities of the situation, an unlawful burden upon interstate commerce.

It would be pertinent in determining this question to review the expanding exercise by the congress in recent decades of its regulatory power under the commerce clause of the constitution. That would require an extended discussion of various federal enactments and a collection and analysis of federal cases not now feasible. In the brief of appellee are cited some of the leading decisions upholding various enactments which constitute this legislative chain. Special attention is called to *Stafford v. Wallace,* 258 U. S. 495, 66 L. Ed. 735, 42 S. Ct. 397, in which the validity of the packers and stockyards act (42 Stat. 159, 7 U. S. C. A., §§ 181-229) was upheld, and to which further reference will presently be made. In the opinion in the Stafford case, extended reference is made to the Swift case. (*Swift and Company v. United States,* 196 U. S. 375, 49 L. Ed. 518, 25 S. Ct. 276.) It was there said that "The principles of the Swift case have become a fixed rule of this court in the construction and application of the commerce clause," and the case of *Lemke v. Farmers' Grain Co.,* 258 U. S. 50, 66 L. Ed. 458, 42 S. Ct. 244, was cited as the then latest expression on the subject. It was said further in the Stafford case: "It is manifest that congress framed the packers and stockyards act in keeping with the principles announced and applied in the opinion in the Swift case." And that "the act deals with *the same current of business,* and the *same practical conception* of interstate commerce." (Italics supplied.)

An oft-quoted statement from the Swift case, *supra,* is as follows:

"Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce." (p. 398.)

In the Stafford case, *supra,* upholding the validity of the act, it was further said:

"The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence, in the form of meat products, to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding places and

fattening farms in the Middle West or East, for further preparation for the market.

．　　．　　．　　．　　．　　．　　．　　．　　．　　．　　．

"The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, *and must be promptly sold and disposed of and moved out to give place to the constantly flowing traffic that presses behind.* The stockyards are but a throat through which the current flows, and the *transactions which occur therein are only incident to this current* from the West to the East, and from one State to another. Such transactions cannot be separated from the movement to which they contribute, and necessarily take on its character. *The commission men are essential in making the sales without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not, in this aspect, merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to, its continuity.*

．　　．　　．　　．　　．　　．　　．　　．　　．　　．　　．

*"The stockyards and the sales are necessary factors in the middle of this current of commerce.*

"The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East." (Italics supplied.) (p. 514.)

Statements of like import might be quoted from many other decisions.

Under the authority and direction of the act, Wichita market has been designated as a public market and made subject to federal regulation. Each market agency there operating must be registered (§ 203), must give bond (§ 204), and must furnish reasonable stockyard services "without discrimination" (§ 205), at rates or charges that are "just, reasonable and nondiscriminatory" (§ 206), which rates and charges must be filed with the secretary of agriculture and subject to his approval (§ 207). I do not understand that the appellant questions these statements as to the provisions of the act. The public stockyards, so designated under the act, and the market agencies there operating have been repeatedly declared to be public utilities. (See among many cases that might be cited, the Stafford case, *supra; Farmers' Livestock Commission Co. v. United States,* 54 F. 2d 375, and the many cases therein cited, p. 379; *U. S. v. Am. Livestock Co.,* 279 U. S. 435, 73 L. Ed. 787, 49 S. Ct. 425; *Atchison Ry. v. United States,* 295 U. S. 193, 79 L. Ed. 1382, 55 S. Ct. 748.) A market agency rendering services under the act thus performs, as a public

utility, a necessary service incident to a continuous flow of livestock from producer to consumer. The market agency is not free to act as it will. It cannot choose those from whom it will take consignments or those to whom sales will be made. It must of necessity act promptly. As stated in the Stafford case, *supra,* the thousands of head of livestock which arrive daily must be promptly disposed of "to give place to the constantly flowing traffic that presses behind." It cannot buy and sell with such profit as it can obtain. Its transactions are at rates whose fairness and reasonableness may be determined by federal authority.

So much for the purposes and the provisions of the act which, in my opinion, have not been given proper weight by this decision.

Now let us look for a moment at the practical aspect of the situation. By this decision we say that a market agency, operating within the limitations imposed by the act, with no knowledge that anyone anywhere has a mortgage lien upon livestock consigned to it for sale, and with no reason to suspect that the shipper and consignor does not have the right to sell the cattle, is bound by constructive notice not only of a mortgage on the cattle recorded in any county in Kansas, but recorded in Texas, New Mexico, or elsewhere from which the constant flow of cattle comes. That view ignores realities. How can the market agency, before accepting the cattle "without discrimination" as it must, protect itself by any sort of inquiry, within any reasonable time? To say that it must do so in one case is to say that it cannot be safe unless it does so in all cases. In my opinion, that places a very heavy burden upon the market agency in the discharge of its duties under the act.

It is conceded that common carriers are not liable to lienholders in the absence of actual knowledge. They are not bound by constructive knowledge of recorded mortgages. The same immunity applies to grain warehousemen who perform services incident to interstate movements of grain. Appellant distinguishes the cases on the ground that in the case of common carriers and warehousemen, title does not pass. It is said in the instant opinion that it was made clear in the Stafford case, *supra,* that the "purchase or sale of livestock by commission companies at the stockyards was a transfer of title to the livestock." Certainly, if the market agency is itself a buyer of livestock it takes title, and passes title when it subsequently sells. But I do not at all read the Stafford case as saying that in cases where the market agency receives for sale upon com-

mission it takes title. The statement in the opinion that "the sales . . . create a local change of title, it is true, but they do not stop the flow" relates to sales made by the market agency. The sales, it is there said, 'do not stop the flow . . . not interfering with, but, on the contrary, being indispensable to its continuity." Further, more, the appellant here does not contend that title passes *to* the market agency. It says in its brief:

"The transaction here in question is not a mere bailment but more in the nature of a consignment for sale and has many of the elements of sale. *We do not mean by this that title passes to the commission merchant,* but certainly the title passes through him . . ." (Italics supplied.)

However, even if we assume, and that only, that title resides, during a brief transitory period, in the market agency, that is wholly incidental to the intermediary service which it renders. I see no fundamental reason, if we are to be realistic, for relieving the railroads from liability and imposing it upon the market agency. Both are essential links in the chain of commerce. In fact, there appears to be less reason to impose constructive notice upon the market agency than upon the railroad. With much less trouble, the railroad can make inquiry to find, at least, whether there are any recorded liens in the county where the traffic originates before accepting the livestock for shipment. The market agency necessarily handles livestock coming often from far distant points, in many states.

It is of course well settled that no state can place any undue burden upon interstate commerce. In the Lemke case, *supra,* the state of Minnesota attempted to regulate the buying of grain at the great grain markets in that state, through which most of the grain moved in interstate commerce. It was contended that the regulations were valid as an exercise of police power by the state. But the United States supreme court, following the principle and its limitations as stated in *The Minnesota Rate Cases* (230 U. S. 352, 57 L. Ed. 1511, 33 S. Ct. 729) that "this principle has no application where the state passes beyond the exercise of its legitimate authority and undertakes to regulate interstate commerce by imposing burdens upon it," invalidated the state act.

The appellant does not discuss the question of whether the imposition upon the market agency of the constructive notice, here at issue, would burden interstate commerce. We shut our eyes to the conditions under which marketing operations at the great livestock

markets are of necessity conducted, involving integrated and fast-moving transactions, if we visualize no real burden by such an imposition. The required acceptance of consignments of livestock often crowding the market and demanding expeditious handling, permits no substantial delay if the service of bringing buyer and seller together is to be well performed. What sort of inquiries must it make in order to escape liability to some unknown mortgagee? How wide a territory must it include in the scope of its delaying inquiries? Only in Meade county in the instant case, or in other Kansas counties as well? Or also in Texas, although this record does not show that it knew the shipper ever lived in Texas? I submit that the burden here imposed upon the interstate operations of the regulated markets is a grave one, tending to delay and impede the service they are instituted to perform. Market agencies cannot be expected to perform expeditious service at the constant risk of great and unknown liabilities. If so, all buyers and sellers must assume the burden of commission fees on an insurance basis to cover the risk. I do not believe any such result was contemplated by the act.

Attention must be given to one other important matter in this case. In its original brief, the appellant cited and quoted at some length from *Brown v. Campbell,* 44 Kan. 237, 24 Pac. 492, in support of its contention that under our decisions a commission merchant handling cattle without actual notice of a mortgage lien is bound by constructive notice of a recorded mortgage and becomes liable to the mortgagee as for a conversion of the property. But the Brown case loses all force on the point here at issue in view of what was said in the later case of *Greer v. Newland,* 70 Kan. 315, 78 Pac. 835. In that case there was a rehearing and second opinion, the first opinion being reported at 70 Kan. 310, 77 Pac. 98. In its reply brief, appellant seeks to minimize the import of the opinion in the Greer case, and quotes largely from what was said in the first opinion. The case did involve, as noted by appellant, the question of whether a commission merchant, under the facts there shown, derives such a benefit from selling mortgaged cattle, without actual notice, as to authorize the mortgagee to waive the tort and recover upon an implied contract. But the case dealt directly with the question of constructive notice. What had been said on that question in the first opinion was the very thing that led to the rehearing. In the opinion upon rehearing it was said:

"Upon a former hearing it was held that they derived no such benefit from the act of conversion as to make them liable in assumpsit by reason thereof, but that, under the authority of *Brown v. Campbell,* 44 Kan. 237, 24 Pac. 492, 21 Am. St. Rep. 274, the record operated to give them constructive notice of the mortgage, and that this had the same effect as actual notice, and rendered them liable as upon contract for their failure to pay the proceeds of the property to the real owner. A grave doubt as to the correctness of this view of the effect of the record led to the granting of a rehearing.

"Upon fuller consideration, we are convinced that all that is said in the case cited regarding the notice imparted by the record of the mortgage is *dictum.*" (pp. 315, 316.)

The court then went on to discuss specifically the question of whether under our mortgage registration law the recording of a chattel mortgage imparts constructive notice to a commission merchant to whom the mortgaged property is sent for sale. It was held, for reasons not necessary here to recite, that he is not so bound under our recording statutes. Syllabus 1, which deals with the question referred to by appellant, as above stated, was modified to conform to the opinion upon rehearing, and syllabus 2 was added, reading as follows:

"The filing of a chattel mortgage for record does not impart constructive notice to a commission merchant to whom the mortgaged property is sent for sale and who sells it and pays the proceeds, less his commission, to his consignor."

As far as we have been able to discover, *Greer v. Newland,* supra, has never been overruled or modified and has stood unchanged for forty-four years. In connection with somewhat different issues but bearing directly upon limitations as to constructive notice under our recording statutes it was cited with approval in *Bank v. Walters,* 92 Kan. 391, 140 Pac. 864, and in *Farmers State Bank v. Bank of Inman,* 123 Kan. 238, 254 Pac. 1038.

If a commission merchant prior to enactment of the packers and stockyards act, who handles livestock on a commission, was not bound by constructive notice of a recorded mortgage, how much more must that be true as to a commission market agency now operating as a public utility within the limitations of the act? Appellant calls attention to the fact that *Brown v. Campbell,* supra, repudiated in the Greer case, *supra,* as to constructive notice was later cited with approval in *Lumber and Grain Co. v. Eaves,* 114 Kan. 576, 220 Pac. 512. Examination of the Eaves case will show that such citation has little, if any, pertinency here. In the Eaves case a lumber com-

pany was held to be bound by notice of a recorded mortgage being in possession of facts which fairly put it upon inquiry. No such circumstances are present here.

This statement must be concluded without discussion of other issues involved in the instant case.

The judgment of the trial court should be affirmed.

Mr. Justice WEDELL and Mr. Justice BURCH concur in the foregoing dissent.