ALLEN C. DRIVER, INC. ET AL. *v.* MILLS
[No. 107, October Term, 1951.]

*Decided March 7, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS and MARKELL, JJ.

*Joseph Whitney Shirley, Jr., for* Allen C. Driver, Inc., appellant.

*William D. Macmillan* and *William A. Fisher, Jr.,* with whom were *Semmes, Bowen & Semmes,* on the brief, for Corkran, Hill & Co., Inc., appellee.

*C. Edward Hartman II,* with whom were *Fell & Hartman* and *James C. Mitchell,* on the brief, for Walter H. Mills, appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This action was brought in the Superior Court of Baltimore City by Walter H. Mills, a resident of Charles County, to recover damages for the conversion of five head of his cattle. The question in the case is whether the Federal Packers and Stockyards Act, 7 U. S. C. A. secs. 181-231, which makes it the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stock-

yard services, operates to relieve such agencies as are licensed under the Act from liability for conversion.

Plaintiff alleged that on August 23, 1950, John C. Thompson stole five head of his Hereford cattle from a field at Welcome, Maryland, and transported them to the Union Stockyards in Baltimore, where he offered them for sale. He delivered them to Allen C. Driver, Inc., a cattle dealer, for sale on commission; and on the same day a salesman for the dealer sold the cattle to Corkran, Hill & Company, Inc., a Baltimore meat packer, at 25 cents per pound. The dealer gave Thompson a check for $780.92, covering the purchase price of $790 less commission, and he cashed the check at a bank. He was subsequently convicted for the larceny of the cattle. Plaintiff brought suit against both the dealer and the purchaser.

The dealer, in its plea denying liability, alleged: (1) that it is licensed under the Packers and Stockyards Act, and it serves merely as a commission firm handling transactions while the cattle are in the stockyards; and (2) that as a licensed commission firm it is required to serve all consignors and is not free to make a choice, and hence the Act changes commission agencies from ordinary factors to public utilities.

The purchaser, in a cross-claim against the dealer, pleaded: (1) that it paid $790 to the dealer for the cattle, and the dealer warranted that it could transfer the title by sale; and (2) that if the dealer could not transfer the title, and plaintiff should recover from the purchaser for the conversion, then the purchaser would sustain damage as a result of the breach of warranty.

The Court, sitting without a jury, found in favor of plaintiff and entered judgment for $790 against defendants, but also entered judgment in favor of Corkran, Hill & Company, Inc., against Allen C. Driver, Inc., in the cross-claim. Both defendants appealed.

It is a settled rule of the common law, founded upon a doctrine of the civil law, that a sale by a person who has no right to sell, is not effective as against the

rightful owner. Thus, under the common law and the Uniform Sales Act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell. Code 1939, art. 83, sec. 41.

Thus a factor, commonly known as a commission merchant, who receives property from his principal and sells it under his instructions and pays him the proceeds of the sale, is guilty of a conversion if the principal had no title thereto or any right to sell the property. The factor cannot escape liability to the true owner for the value of the property by claiming that he acted in good faith and in ignorance of the principal's want of title. *Levi v. Booth,* 58 Md. 305, 42 Am. Rep. 332.

The Packers and Stockyards Act was enacted by Congress on August 15, 1921. The term "stockyard," within the meaning of the Act, is any place commonly known as stockyards conducted as a public market, consisting of pens or other inclosures, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce. Sec. 202.

The Act defines the term "market agency" as any person engaged in the business of (1) buying or selling in commerce livestock at a stockyard on a commission basis or (2) furnishing stockyard services. The term "dealer" means any person, not a market agency, engaged in the business of buying or selling in commerce livestock at a stockyard, either on his own account or as the employee or agent of the vendor or purchaser. Sec. 201.

The particular provision of the Act which has been emphasized on this appeal is that contained in Section 205: "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request,

without discrimination, reasonable stockyard services at such stockyard * * *."

In 1922 the United States Supreme Court in *Stafford v. Wallace,* 258 U. S. 495, 42 S. Ct. 397, 402, 66 L. Ed. 735, 23 A. L. R. 229, sustained the constitutionality of the Act and held that market agencies connected with stockyards are public utilities. Chief Justice Taft said in the opinion of the Court: "The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, and must be promptly sold and disposed of and moved out to give place to the constantly flowing traffic that presses behind. * * * The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. It assumes that they conduct a business affected by a public use of a national character and subject to national regulation."

In three cases (*Blackwell v. Laird,* 236 Mo. App. 1217, 163 S. W. 2d 91; *Sullivan Co. v. Wells,* D. C. 89 F. Supp. 317; and *Montana Meat Co. of Helena v. Missoula Livestock Auction Co.,* Mont., 230 P. 2d 955) it has been held that a commission merchant licensed under the Act is not liable to the owner of cattle for conversion. Those decisions have been based on the theory that the common-law rule of agency has become a harsh one as the relationship between principal and agent has become more and more impersonal, and that the Packers and Stockyards Act, by forcing cattle commission agents to serve all persons without discrimination, makes application of the common-law rule oppressive.

But it is held by the weight of authority that the Act, while making it the duty of licensed market agencies to furnish stockyard services upon reasonable requests without discrimination, does not absolve the broker from liability for conversion. *Mason City Production Credit Ass'n v. Sig Ellingson & Co.,* 205 Minn. 537, 286 N. W. 713, *certiorari* denied, 308 U. S. 599, 60 S. Ct.

130, 84 L. Ed. 501; *First National Bank of Pipestone v. Siman,* 67 S. D. 118, 289 N. W. 416; *Moderie v. Schmidt,* 6 Wash. 2d 592, 108 P. 2d 331; *Birmingham v. Rice Bros.,* 238 Iowa 410, 26 N. W. 2d 39, 2 A. L. R. 2d 1108; *Citizens State Bank of Delhart v. Farmers Union Livestock Cooperative Co.,* 165 Kan. 96, 193 P. 2d 636; *De Vries v. Sig Ellingson & Co.,* 100 F. Supp. 781. We think it preferable to follow the majority rule.

While it is a general principle that a public utility is under a legal obligation to render adequate and reasonably efficient service impartially and without unjust discrimination, a market agency is certainly not required to handle stolen livestock or livestock to which the title is defective. We assume that an agency could demand that any person desiring to deal with it must establish his identity and his title to the livestock which he offers for sale. We cannot assume that Congress enacted the Packers and Stockyards Act to protect the operation of stockyards for handling property that has been stolen or obtained by fraud. The Act unquestionably makes it the duty of market agencies to furnish "upon reasonable request" without discrimination reasonable stockyard services. But to refuse to co-operate with a criminal in his crime is not "wrongful discrimination." Nor is a request that an agency dispose of property stolen or fraudulently obtained a "reasonable request."

It may be observed that Section 217a permits the charging of a fee, when authorized by the Secretary of Agriculture, for the inspection of brands or marks of livestock shipped from a State in which branding or marking prevails. The Act declares that the inspection is "for the purpose of determining the ownership of such livestock." This provision, giving the agencies one means of protecting themselves, is indicative of the intent of the Act that the market agencies should be on guard against conversion.

Although the Act does burden the operations of commission agencies to some extent, as they are supervised by the United States Department of Agriculture in

Washington, we do not think that it necessarily follows that Congress intended to relieve such agencies from liability in tort for conversion, and thus abrogate the inveterate law of the State. The Act was passed to remedy the abuses that had grown up in the large stockyards in various parts of the country whereby raisers and shippers of livestock were charged excessive and discriminatory rates for services rendered in handling and selling the livestock after reaching the yards. There is nothing in the Act to indicate that Congress intended to protect market agencies or purchasers at the stockyards from liability on account of fraudulent sales of livestock either not owned by the consignors at all or covered by chattel mortgages.

As we hold that the Act of Congress does not absolve either the market agency or dealer from liability for conversion, the judgments appealed from will be affirmed.

*Judgments affirmed, with costs.*