[Sac. No. 4818. In Bank.—June 22, 1934.]

LUSITANIAN–AMERICAN DEVELOPMENT COMPANY (a Corporation), Respondent, v. THE SEABOARD DAIRY CREDIT CORPORATION, Appellant.

Walter J. Little, A. J. Carlson and Robert W. Anderson for Appellant.

Edmund de Freitas and C. H. Hogan for Respondent.

PLUMMER, J., *pro tem.*—The plaintiff had judgment in this action for the sum of $8,585 against the defendants George W. Smith, Ella Smith, Jacob Kooyman, Peter Kooyman, W. Feinstein, John Kooyman, The Seaboard Dairy Credit Corporation, Ed Haecker and Ord L. Leachman, for and on account of the alleged conversion of a certain herd of cattle. From this judgment the defendant Seaboard Dairy Credit Corporation appeals.

The record shows that prior to the fifteenth day of February, 1928, the plaintiff was the owner of certain real estate situate in the county of San Joaquin, and also of a certain herd of cattle then running, being and kept on said real estate. On the fifteenth day of February, 1928, the plaintiff and the defendants Kooyman entered into a conditional contract of sale for the purchase of real estate, and also of the herd of cattle referred to, consisting at that time of 140 milk cows, 82 heifers, ranging in age from one month to two years, and two bulls two years old, most of the herd being branded "R–X" on the right hip. The contract price for the property covered by the conditional sales contract was the sum of $100,000, of which sum $18,000 was the agreed purchase price of the cattle.

The conditional contract specified that the purchaser should not transfer or sell said property without the written consent of the plaintiff. The Kooymans remained in possession of said property until on or about the seventh day of December, 1929, on which date, with the consent of the plaintiff, the Kooymans transferred their interest in the conditional sales contract to George W. Smith and Ella Smith, his wife, subject, however, to the payments and covenants contained in the conditional contract of sale.

On the twenty-seventh day of December, 1929, the Smiths, without the consent of the plaintiff, assigned their interest in said contract, and delivered possession of both the real and personal property described therein to the defendants Otto Prinz and Rose Prinz. Subsequently, and on or about the twenty-seventh day of January, 1930, the defendants Prinz sold and transferred their interest in said herd of cattle to the defendant Feinstein. Feinstein was familiar with the ranch and the personal property, and had previously had dealings with the Kooymans, and also with Mr. Nunes, president of the plaintiff corporation. Feinstein purchased the cattle without making any investigation as to the ownership thereof. After the purchase just recited the cattle were left upon the ranch for the purpose of disposing of them at public auction. For this purpose the defendant Feinstein secured the services of the Seaboard Dairy Credit Corporation to act as auctioneer.

On the third day of February, 1930, the cattle were sold at public auction at the ranch referred to and covered by the conditional contract of sale. Defendants Haecker and Leachman acted as auctioneers and employees of the defendant Seaboard corporation. After the sale the Seaboard Dairy Credit Corporation paid to the defendant Feinstein the proceeds derived from said auction sale, after having deducted an agreed percentage for commissions in payment of its services in conducting the sale.

The appellant's preliminary statement of the questions involved upon this appeal are:

1. Whether the plaintiff and respondent knew of the pendency of the sale of the cattle;

2. Whether the cattle sold were actually cattle belonging to the plaintiff; and

3. Whether the appellant was guilty of acts amounting to conversion.

Elaborating upon these points it is contended that the evidence is insufficient to support the finding that the plaintiff did not acquiesce in the sale; that the evidence is insufficient to support the finding that appellant sold 101 head of cattle described in the conditional contract referred to herein; also, that the evidence is insufficient to support the finding of conversion of the cattle on the part of the Seaboard Dairy Credit Corporation. For convenience we will

reverse the order of the points listed by the appellant, and answer the third objection first.

■ The record shows, in connection with the testimony of Mr. Harden, who stated that he was the manager of the Seaboard Dairy Credit Corporation, having its offices at Modesto, that an agreement was entered into between W. Feinstein and the Seaboard corporation for the sale of 101 head of dairy cattle and two bulls, the cattle being described as then being one-half mile north of Bethany, which the testimony shows to be the location of the real property described in the agreement.

To show the agency and the active participation of the Seaboard Dairy Credit Corporation in the conversion of the cattle we quote from the agreement the following:

"Party of the first part to provide an auctioneer and do the advertising and promotion of said sale; unless total proceeds of sale amount to less than $2,000.00 then party of the second part shall pay for advertising. Posting of bills and any local advertising, shall be done by party of the second part. Party of the second part shall be responsible for all representations made by him, as to property offered for sale, and agrees to indemnify the party of the first part and buyers at said sale for any damages sustained by reason of any misrepresentations made by him regarding property sold. Party of the first part assumes no responsibility for any stock sold which is not settled for. Party of the second part agrees that all of said property above mentioned shall be offered for sale at said auction, and also agrees not to dispose of or sell any part of the property herein listed before said auction sale without first obtaining permission from party of the first part, and agrees that if any of said property is so sold, to pay to the party of the first part 7 per cent commission on selling price of same.

"Party of the first part agrees to turn over to party of the second part, proceeds of sale, less the above charges, as soon as checks clear, or not later than twelve days. Party of the first part agrees to give terms to purchasers of cattle at sales which shall be: Sums of $100.00 or under, cash. On sums over $100.00 purchaser may pay all cash, or pay one-third cash and the balance in 9 equal monthly payments. It is understood that the clerking of the sale

and handling of the paper is to be done by The Seaboard Dairy Credit Corp.

"Witness the signature of the parties hereto.

"SEABOARD DAIRY AUCTIONEERS
"W. FEINSTEIN."

Following the execution of this agreement the defendant Feinstein indorsed on the agreement the following (omitting date): "I hereby authorize Seaboard Dairy Credit (Corporation) to pay to Kooyman and Connors the sum of $2800.00 from my auction sale described on other side of this contract. W. Feinstein."

The record then shows that the manager of the corporation testified that the $2,800 was paid by the Seaboard Dairy Credit Corporation to either Kooyman or Connors. The manager of the Seaboard Dairy Credit Corporation testified further that he made no investigation as to the title of the cattle sold at the auction sale. While testifying that the sale was held at the ranch referred to as belonging to the plaintiff, he did not know who owned the ranch. The record further shows that an employee of the Seaboard Dairy Credit Corporation acted as clerk at the sale.

In relation to the agreement which we have just set out, we quote the following testimony given by Mr. Harden, to wit: "Q. I mean leading up to your auction sale held on or about February 2, 1930, or immediately preceding that auction sale, did you have any business dealings with Mr. Feinstein? A. Mr. Feinstein, Mr. Prinz and Mr. J. Kooyman came into the office, and Mr. Feinstein had purchased from Mr. Prinz so many head of dairy cattle—I forget the exact number—and Mr. Feinstein asked if our auctioneers that were working with us would handle the sale, and said he was going to sell the cows, and wanted us, if there should be any paper, to handle that paper in the sale." We think this testimony sufficiently shows the participation of the appellant in the execution of the agreement which we have set out, whether the agreement was arranged by Mr. Harden or by the auctioneers.

Mr. Harden further testified that the contract for the auction sale was executed by the auctioneers and Feinstein in his office; that the auctioneers worked on a commission basis.

Plaintiff's exhibit No. 7 shows a sale of the cattle to the value of $7,547, and in making settlement with Feinstein there was deducted from this sale cattle bid in by Feinstein of the value of $2,275, leaving the sum of $5,272, upon which commissions were calculated at the rate of seven per cent interest, amounting to the sum of $369.04. Of this sum $50.70 was deducted on account of advertising and telephone expenses, leaving $318.34, of which the auctioneers received the sum of $159.17 and the Seaboard Dairy Credit Corporation a like sum of $159.17.

■ In the face of what we have recited the objection that the court erred in allowing the two auctioneers to testify that they were the agents of the corporation does not seem to us to be well taken, as the facts which we have stated are sufficient to show the active participation of the corporation in the auction sale, and its receipt of its share of the profits of the transaction.

■ Through the medium of a conversation had between Mr. Smith and Mr. Nunes, the president of the plaintiff corporation, the appellant sought in the trial court and also here seeks to establish the fact of consent on the part of the plaintiff, to the sale of the cattle, and also to establish an estoppel as against the plaintiff. The testimony is too lengthy to be set forth herein, but the following excerpt is sufficient to show the position taken by the appellant, and which, with other testimony to the same effect, sustains the finding of the court negativing the contention of the appellant. We quote from Mr. Nunes' testimony as to the alleged conversation: "A. I remember while Mr. and Mrs. Smith were there he told me that those cows had been inspected by the State Inspector and they found quite a few T.B., and he wanted to get a permit from the company to dispose of those cows, those T.B.'s, and buy other cows to put in their place. I told Mr. Smith that I had no time to investigate anything, that I had to leave and I could not give him any permit whatsoever. Q. You told him that you would not consent? A. Yes, sir. Q. Mr. Nunes, when did you first learn that there had been a sale, an auction sale on the ranch in question? A. Well, it was long after the sale, after the cows were sold, I don't remember just when it was when I learned that the cows were not on the ranch and that they had disposed of the cows, they

were gone, and I don't know just when." This witness further testified that he did not tell anyone that he knew of the auction sale prior to the sale. Mr. Smith's testimony was to the effect that in a conversation with Mr. Nunes he told him of the impending auction sale. Nunes' testimony as to his version of the conversation is corroborated by the testimony of another witness.

As to the question of estoppel we have searched the record from beginning to ending, and failed to find any testimony set forth therein to the effect that the appellant in this action was ever advised of the alleged conversation either as to the version given by Mr. Smith or the version thereof testified to by Mr. Nunes. Nor is there any testimony in the record to the effect that the appellant acted on any information as to whether the president of the plaintiff did or did not consent to the sale, or did or did not know of the sale. There is not a scintilla of evidence in the record that the action of the appellant was influenced in any particular by any act or word of any of the officers of the plaintiff.

As set forth by the respondent in its brief, in order to invoke the doctrine of estoppel it must be shown—First: That the party to be estopped was apprised of the facts; second: That the party to be estopped must have intended that his conduct should be acted upon, and must have so acted that the party asserting the estoppel had a right to believe it was so intended; third: That the party invoking the estoppel was ignorant of the true state of facts; and, fourth: That the party invoking the estoppel must have relied upon the conduct of the other party to his injury.

In 21 C. J., page 1133, the basis of an estoppel is thus set forth: "It is essential to an equitable estoppel that the person asserting the estoppel shall have done, or omitted some act, or changed his position in reliance upon the representations or conduct of the person sought to be estopped." To the same effect is the language of the court in the case of *Gejanich* v. *Gregory*, 116 Cal. App. 622 [3 Pac. (2d) 389], where a number of authorities are cited supporting the rules which we have just set forth. (See, also, 10 Cal. Jur., pp. 630–639.)

Without further elaboration it must be held that the appellant's contention that the plaintiff consented to the

sale is not well taken, and likewise, that there is no merit in the argument that the plaintiff is in anywise estopped.

In view of the facts which we have recited, and the lack of any testimony in the record showing that the appellant acted upon any word or conduct of the officers of the plaintiff, it is unnecessary to review and show the inapplicability of the cases where the doctrine of estoppel has been invoked, as in all those cases the facts set forth show that the party in whose favor the doctrine was upheld, acted upon representations and conduct of the adverse party.

█ The foregoing facts, gleaned from the record, show that the appellant exercised dominion and control over the property, and' made sale thereof without the consent of the owner. This amounts to conversion. ''A sale of personal property to another is an actionable conversion where it is wrongful or unauthorized by law, or without the consent of the owner and in defiance of his rights.'' (35 C. J., p. 38.) ''This rule has been applied to sales by commission merchants and auctioneers.'' (24 Cal. Jur., p. 1026.)

In *Mier* v. *Southern California Ice Co.*, 36 Cal. App. 512 [206 Pac. 83], the opinion states the rule in this language: ''Any act of ownership or exercise of dominion over the property of another in defiance of his rights is a conversion of the property.'' And further: ''And the general rule is that one who sells the property of another, even though he believes he has a right so to do, is liable in trover to the true owner.'' (Citing *Swim* v. *Wilson*, 90 Cal. 126 [27 Pac. 33, 25 Am. St. Rep. 110, 13 L. R. A. 605; *Clark* v. *Whiteus*, 69 Okl. 318 [171 Pac. 746] ; 28 Am. & Eng. Ency. of Law, 2d ed., 702.)

The rules above stated as to what constitutes conversion have been the settled' law of this state since the decision in the case of *Swim* v. *Wilson, supra*. In that case a broker sold stock in good faith, thinking it belonged to the person who tendered it for sale. The person who brought the stock to the broker for sale appears to have stolen the same. It was held that the broker was liable to the true owner.

No issue is tendered as to the value of the cattle, or as to the fact that the conditional contract of sale reserved ownership in the plaintiff.

■ It is finally contended that the testimony does not support the finding that the appellant sold cattle belonging to the plaintiff. Our attention has been called to the testimony of several witnesses pertaining to this subject. However, only a few excerpts need be taken therefrom to show that the finding of the trial court as to the identity of the cattle sold is amply supported.

The testimony of Peter Kooyman, one of the parties to the original contract, is to the effect that he was on the ranch where the cattle were kept, on the thirty-first day of January, 1930, just three days before the sale; that the cattle there were the same cattle that were on the ranch which he bought from the plaintiff, and the same cattle that were assigned by the Kooymans to Smith. This witness testified that he milked the cattle every day for a period of twenty-two months. The testimony of this witness shows that the cattle were mostly Holsteins; that there had been some replacements in the herd of cattle. This witness further testified as follows: "After my brothers and I sold, and after I assigned the contract to the Smiths, I continued to live on the ranch." After testifying as to there being 127 head of milk cows the following question was put to this witness: "Now, the question is, were those 127 head of milk cows a part of the herd that was on the ranch when you and your brother took it from the Lusitanian-American Development Company, a corporation? A. Yes."

The testimony of Mr. Feinstein shows that he bought the cattle on the ranch identified by the witness Kooyman. Feinstein testified as follows: "I bought them on the 27th day of January, 1930, and I left them at the ranch until the 3rd day of February, when I sold then at auction. From the 27th day of January, to the 3rd day of February, I made visits to the ranch to see the cattle." There is further testimony corroborative of what we have just set forth, which shows that the identity of the cattle sold at public auction was sufficiently established as being the cattle belonging to the plaintiff herein.

The judgment is affirmed.

Waste, C. J., Shenk, J., Langdon, J., Curtis, J., and Preston, J., concurred.