**UNITED STATES of America,**
**Plaintiff,**

v.

**Henry W. MATTHEWS and Nettie**
**Matthews, etc., Defendants.**

**No. 7124.**

United States District Court
N. D. California, N. D.

Feb. 29, 1956.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for plaintiff.

Weis & Weis, Yuba City, Cal., for defendants.

EDWARD P. MURPHY, District Judge.

This is an action for conversion brought by the United States against Henry W. Matthews and Nettie Matthews, doing business as Yuba City Livestock and Auction Company. Jurisdiction is derived from 28 U.S.C. § 1345.

On March 17, 1951, one Wheaton executed a crop and chattel mortgage to the Farmer's Home Administration, an agency of the plaintiff. The mortgage covered farm implements, machinery, and certain livestock specifically listed, as well as after-acquired livestock and property. It contained the usual provision that upon default, the mortgagee was entitled to immediate possession of the mortgaged goods. The mortgage was duly recorded on March 17, 1951 in Yuba County, the county in which Wheaton then resided and in which the property in question was then located.

On November 19, 1951, Wheaton defaulted on his obligations to the plaintiff and remained in default from that date until March 2, 1953. During the period in which he was in default, November 19, 1951 to March 2, 1953, Wheaton fraudulently removed, from time to time, certain of the livestock mortgaged to plaintiff and took them to Sutter County, where the defendants' business is located. Wheaton there had defendants sell the livestock at auction in the regular course of their business and turn the proceeds, less commission, over to him. Defendants did so, after obtaining Wheaton's signed assurance and warranty that the animals were free and clear of all liens or other encumbrances, including mortgages. There is no question regarding defendants' state of mind.

They at no time during the relevant period had knowledge of plaintiff's claim or interest in the livestock. Nor is there any question of negligence by reason of facts which might have alerted them to the possibility that the goods were mortgaged to the plaintiff.

Defendants sold the animals for a total of $1526.22. From this sum, they subtracted their regular sales commission of 3% plus all expenses of the sale, and turned the net proceeds over to Wheaton.

On September 30, 1954, the United States brought this action for conversion against the defendants. The question presented is whether an auctioneer is liable in conversion to a mortgagee with a right to possession, where the auctioneer without knowledge of the mortgage in default, and in the absence of other facts which would alarm the reasonably prudent man to such a state of the title, sells goods presented to him in the ordinary course of business by the mortgagor in possession, and turns the proceeds over to that mortgagor.

The cases are quite numerous which have held auctioneers liable in conversion for selling mortgaged or stolen property, but only a few deal with the precise issue here presented. In considering that issue, therefore, we must leave aside the cases holding the auctioneer liable for selling the mortgaged or stolen goods *with knowledge* of the interest of the true owner in the goods, such as Dixie Stock Yard v. Ferguson, 1941, 192 Miss. 166, 4 So.2d 724; Green v. Crye, 1928, 158 Tenn. 109, 11 S.W.2d 869; and Forbush v. San Diego Fruit & Produce Co., 1928, 46 Idaho 331, 266 P. 659. In cases such as those, the rationale of the rule holding the auctioneer liable is easy to perceive and eminently just. Once the auctioneer is informed that the title in the property he is about to sell is in dispute, he acts at his peril in persisting in the sale. If he pays the proceeds to the wrong party after having been alerted to the disputed ownership, he should undoubtedly be held liable to the rightful owner. That principle was all that was

involved in those cases. Whatever else may have been said there on either side of the question now before the court was dictum only.

Plaintiff further contends that the defendants in the case at bar had "constructive notice" from the proper recordation of the mortgage, and should therefore be held liable. This argument is entirely unfounded. The effect of recordation statutes of the type of that here involved, Cal.Civ.Code § 2957, is clearly limited to purchasers and creditors or other encumbrances, and has been held uniformly not to be applicable to auctioners without a property interest in the goods. First National Bank of Pipestone v. Siman, 1937, 65 S.D. 514, 275 N.W. 347; Frizzell v. Rundle, 1890, 88 Tenn. 396, 12 S.W. 918; Greer v. Newland, 1904, 70 Kan. 315, 78 P. 835, 70 L.R.A. 554; Kearney v. Clutton, 1894, 101 Mich. 106, 59 N.W. 419. The California cases, discussed below, do not even trouble to refute the suggestion of "constructive notice" to an otherwise innocent auctioneer on the basis of the recording of a mortgage. The fact of recording, therefore, is irrelevant to our inquiry, and does not require further discussion.

We come now to the cases directly in point, holding the auctioneer liable in conversion although his payment of the proceeds to the mortgagor in possession was innocent and reasonable. The latest of these that has been found is First National Bank of Pipestone v. Siman, 1937, 65 S.D. 514, 275 N.W. 347, 349. In that case, commission merchants sold sheep in the course of their business, and paid the proceeds over to the mortgagee, unaware that the mortgage was in default. They were held liable in conversion to the mortgagee. The court cited, as does the plaintiff here, the Restatement of Agency, Section 349 of which reads as follows:

"'An agent who does acts which would otherwise constitute conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reason-

ably, although mistakenly, believes that the principal is entitled to possession of the chattels.'"

The court then cites at 275 N.W. 349, a number of cases in support of the application of this principle to auctioneers without notice. The cited cases include Greer v. Newland, 1904, 70 Kan. 310, 77 P. 98, 70 L.R.A. 554, and Forbush v. San Diego Fruit & Produce Co., 1928, 46 Idaho 231, 266 P. 659. The citation in the Greer case refers to the first hearing of that case in the highest court of Kansas. It was an action in contract, not in conversion, and the auctioneers were held liable on the ground that they had had "constructive notice" by reason of the recording of the mortgage. On rehearing, 1904, 70 Kan. 315, 78 P. 835, the court held that there was no "constructive notice", and that the auctioneers could not be liable under the theory of contract, in any event. It reversed and remanded the case below. No subsequent decision is recorded. The Forbush case involved notice to the auctioneer, thus taking it out of the class of cases dealing with the principle contended for now, and raised a further question as to the interest of the auctioneers in the property itself, the court saying that the auctioneers had a status with respect to the property "not that of a mere commission merchant." 266 P. 664.

Of the other cases cited by the court, a number squarely support the rule contended for by plaintiff here. Kearney v. Clutton, 1849, 101 Mich. 106, 59 N.W. 419, holds an innocent auctioneer liable in conversion, pointing out that the auctioneer may protect himself against such liability by requiring indemnity from the seller. Robinson v. Bird, 1893, 158 Mass. 357, 33 N.E. 391, holds an innocent auctioneer liable, without discussion. Spraights v. Hawley, 1868, 39 N.Y. 441, 100 Am.Dec. 452, holds the auctioneer liable as an agent of a converter, assisting in the conversion. Wing v. Milliken, 1896, 91 Me. 387, 40 A. 138 is a more doubtful case, for the reason that the defendant there may have been some-

thing more than an auctioneer or commission merchant acting in the regular course of his business.

Many of the cases holding the innocent auctioneer liable make reference to the early New York case of Hoffman v. Carow, 1839, 22 Wend., N.Y., 285. That interesting case, dealing with the liability in conversion of an innocent auctioneer, for the sale of stolen goods, was decided by a vote of fifteen Senators and the Chancellor against the votes of five Senators. Three opinions were written for the majority, holding the auctioneer liable although innocent. The Chancellor's opinion, at 22 Wend. 293, treated the case as one of the rights of true owner and purchaser in stolen property, and showed that under the English law the doctrine of *market overt* did not bar a suit to recover stolen property from the innocent purchaser. Senator Edwards, also for the majority, seemed to assume that to hold for the auctioneer would be to deprive the rightful owner of his remedies against all others, including the purchaser, again under the doctrine of *market overt*. See 22 Wend. 295. Senator Verplanck, for the majority still, agrees that when the handling of the goods in question is done by "mere agents", it would be unjust to impose liability upon the "common carriers, ship masters and others, through whose hands goods feloniously or wrongfully obtained might pass." He then distinguishes the case under consideration by pointing out that the auctioneer performs the act which is the *conversion* of the goods into money, and that therefore he should be liable. Thereupon, Senator Verplanck puts forward the theory which has become the modern rationalization of the rule, despite its conceded harshness:

"In this instance the rule falls hardly upon innocent and honorable men; but looking to general considerations of legal policy, I cannot conceive a more salutary regulation than that of obliging the auctioneer to look well to the title of the goods which he sells, and in case of feloni-

ously obtained property, to hold him responsible to the buyer or the true owner, as the one or the other may happen to suffer. Were our law otherwise in this respect, it would afford a facility for the sale of stolen or feloniously obtained goods, which could be remedied in no way so effectually as by a statute regulating sales at auction, on the principles of the law as we now hold it." 22 Wend. 319, 320.

The minority in Hoffman was represented by a vigorous dissent by Senator Furman. After examining the precedents upon which the majority rely and pointing out that they do not extend to the case of an auctioneer entirely innocent of knowledge, Senator Furman examines the policy reasons tendered by Senator Verplanck, and comes out at an opposite conclusion. He warns that the doctrine of the majority would tend to destroy the useful function rendered by auctioneers to the community of farmers and planters. 22 Wend. 307. He further challenges the proposition that the auctioneer plays a role so vital to the conversion of the property as to require his liability, saying:

"The only ground upon which a party should be held liable, is that he has the property or its value in his possession, or has with knowledge or under notice, illegally disposed of it; and not by reason of having been the mere conduit for its transmission from one to another, and that without notice or knowledge of any claim having been set up to the property by a third person." 22 Wend. 308.

"An auctioneer does not claim the goods as his own, or assume any right in or over or to dispose of the same as his own property. It is true he has a special interest in goods sent to him to be sold, and a lien on them, or their proceeds, for duty payable to the State; he may sue the buyer for the purchase money; and is responsible to the vendee for the fulfillment of the contract of sale

unless he discloses the name of his principal at the time of sale; yet, for all other purposes, he is the mere agent for the transmission of goods from one set of traders to another." 22 Wend. 313.

Senator Furman also points to the injustice of imposing liability upon persons who are without fault or moral blameworthiness, arguing that the element of intent, or scienter, should be considered in this situation as it is in other areas of the common law, such as fraud. 22 Wend. 313.

The basic considerations of policy put forward by Senator Verplanck, for liability, and by Senator Furman, against it, have continued to be the points of subsequent discussion and decisions. The rule imposing liability was rejected first in Frizzell v. Rundle, 1890, 88 Tenn. 396, 12 S.W. 918. It has been vigorously criticized by an able commentator, who points out that it is anomalous to relieve from liability for accidental personal injury, caused without culpability, but to impose liability for accidental injury to property, also caused, or contributed to, without culpability. See 15 Harv.L.Rev. 335, 346 (1902). In addition to Frizzell, supra, a number of other states seem to have adopted Senator Furman's argument in dissent as the law of the case. See Dixie Stock Yard v. Ferguson, 1941, 192 Miss. 166, 4 So.2d 724 (approving Frizzell, at page 727, but decided on the issue of actual notice; and cf. Leuthold v. Fairchild, 1886, 35 Minn. 99, 27 N.W. 503, 28 N.W. 218. It may be said, in order to satisfy the Restatement, that the auctioneers in these jurisdictions are not agents of the seller for the purpose of the conversion, although they are his agents for certain other purposes. Such a restatement of the Restatement would serve only to point up the inevitable inadequacy of a single general rule to encompass the many underlying considerations involved in the issue of the auctioneer's liability.

The considerations against liability are the usefulness of the auctioneer's function, the heavy burdens involved in holding him to a search of the seller's title, and his moral blamelessness under our set of facts. The considerations for liability are the degree of his participation in the wrongful disposition of the property, and his opportunity to act as an investigator of the seller's title. At bottom, what the jurisdictions which have rejected liability have done, is to weigh these competing considerations and decide that those against liability are the stronger ones.

On the part of the jurisdictions imposing liability, it is said in mitigation of the harshness of the rule, that the auctioneer can protect himself by checking the records of the place of origin of the property. If the auctioneer's fee were to reflect that burden, however, a substantial change in the size of the commission disclosed here would be necessary. And this would put the auctioneer at the mercy of the seller who lies to him as to the place of origin, or at the least require further investigation as to that question. It is said that the auctioneer can require indemnity of the seller, and thus protect himself. This does not strike a wholly convincing note. If the indemnity of the wrongful seller were worth anything, the auctioneer would not in most cases be in court. The rule imposing liability upon the auctioneer, viewed realistically, does more than shift the burden of suing the original wrongdoer from the true owner to the auctioneer. In effect, it shifts the loss to the auctioneer. It may be thought necessary, as a matter of policy, to add to the existing remedies of the true owner an action in conversion against the innocent middleman. Such a rule is not without reason, but it should be adopted, if at all, with a full realization of its effects.

The California courts, after initially exempting the innocent auctioneer from liability in Rogers v. Huie, 1852, 2 Cal. 571, 56 Am.Dec. 363, have reversed their stand, and now would, without much doubt, hold the auctioneer at bar here liable. Swim v. Wilson, 1891, 90 Cal.

126, 27 P. 33, 13 L.R.A. 605;[1] Lusitanian-American Development Company v. Seaboard Dairy Credit Corp., 1934, 1 Cal.2d 121, 34 P.2d 139.

If this case were here under diversity jurisdiction, it would end with the above conclusion, under the rule of Erie R. Co. v. Tompkins, 1934, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. This case is here, however, by virtue of the jurisdiction of the federal district courts over cases in which the United States is a party. 28 U.S.C. § 1345. The plaintiff is in this court pursuant to its authority to sue and be sued under 7 U.S.C.A. § 1014, establishing the Farmers' Home Corporation. Under these circumstances, the law governing plaintiff's action is the common law prevailing in the federal courts when no choice of state law is indicated by Congress. Clearfield Trust Company v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838. In Clearfield, a federal district court sitting in Pennsylvania had applied a Pennsylvania rule of laches to deny relief to the plaintiff, the United States, suing on some commercial paper. The Court of Appeals for the Third Circuit reversed, on the ground that Erie R. Co. v. Tompkins did not apply. 3 Cir., 1942, 130 F.2d 93. On appeal to the Supreme Court, Mr. Justice Douglas, speaking for a unanimous Court[2] said [318 U.S. 363, 63 S.Ct. 574]:

"We agree with the Circuit Court of Appeals that the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for services performed under the Federal Emergency Relief Act of 1935, 49 Stat. 115, 15 U.S.C.A. §§ 721–728. The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. * * * The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. * * * In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards. * * * "

This doctrine of the federal common law is amply supported by authority. Deitrick v. Greaney, 1940, 309 U.S. 190, 60 S. Ct. 480, 84 L.Ed. 694; Board of County Commissioners of Jackson County v. United States, 1939, 308 U.S. 343, 60 S. Ct. 285, 84 L.Ed. 313; D'Oench Duhme & Co. v. Federal Deposit Insurance Corp., 1942, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956. In the D'Oench case, Mr. Justice Jackson, in an illuminating concurring opinion, said:

"A federal court sitting in a nondiversity case such as this does not sit as a local tribunal. In some cases it may see fit for special rea-

1. In Swim v. Wilson, 1891, 90 Cal. 126, 27 P. 33, the Court announced that the Rogers case had been "practically" overruled by the case of Cerkel v. Waterman, 1883, 63 Cal. 34. That case involved commission merchants who had been charged to sell the barley of one Wilson. By mistake, they also sold wheat belonging to the plaintiff and paid the proceeds to Wilson. As a matter of negligence, or contract, it may be clear that one man's wheat is not another's barley. It does not appear necessary, however, to import that undoubted proposition into the issue now under consideration. The Court in the Swim case went on to say that the Rogers case was in any event opposed to the weight of authority and principle. 90 Cal. 126, at page 131, 27 P. 33.

2. Only seven members sat. Messrs. Justices Murphy and Rutledge did not participate in the case.

sons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present.
\* \* \*

"The law which we apply to this case consists of principles of established credit in jurisprudence selected by us because they are appropriate to effectuate the policy of the governing Act. The Corporation was created and financed in part by the United States to bolster the entire banking and credit structure. The Corporation did not simply step into the private shoes of local banks." At page 472 of 315 U.S., at page 686 of 62 S.Ct.

It is true that Mr. Justice Jackson, in discussing the basis of jurisdiction in the D'Oench case pointed out that the statute creating the Federal Deposit Insurance Corporation, the federal agency involved in that case, contained a clause not found in the creating statute of the plaintiff now at bar, to the effect that all suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States. 12 U.S. C.A. § 264(j). But he took care to say:

"This is not to suggest, however, that questions not specifically dealt with in these statutes cannot be federal questions simply because of the absence of an express provision that suits 'shall be deemed to arise under the laws of the United States.'" 315 U.S. 468 note 5, 62 S.Ct. 684.

If this suit were being brought in Tennessee, on the basis of the mortgage held by the Farmers' Home Corporation, and the defendant there sought to evade liability under some local theory of defense, he could not prevail if that local theory were at variance with the law of the United States as developed in the federal courts in non-diversity cases. The case is here to be determined, therefore, under the federal common law.

The federal case in point is Drover's Cattle Loan & Investment Company v. Rice, D.C.N.D.Iowa 1926, 10 F.2d 510 a diversity case before Erie R. Co. v. Tompkins, and therefore governed by the rule of Swift v. Tyson, 1840, 16 Pet. 1, 10 L.Ed. 865, under which the federal courts were not bound to follow the judicial law of the States, and developed a body of federal decisional law. The rules of decision applicable in diversity cases under Swift v. Tyson, therefore, are the same as those applicable to non-diversity cases in the federal courts under Erie R. Co. v. Tompkins, at least for present purposes. In Drover's Cattle Loan & Investment Co. v. Rice, Judge Scott carefully examined the precedents cited on both sides of the precise issue now under consideration, the innocent sale of mortgaged cattle by an auctioneer, and concluded that the rule of Frizzell v. Rundle, rejecting the auctioneer's liability, was the better rule. The opinion is predominantly concerned with the issue of "constructive notice", but Judge Scott specifically considers the rule of strict liability contended for by plaintiff here when he says:

"Some cases cited proceed upon the theory that a mortgagor in possession, who sells the property, assumes the attitude of a thief, and that any one meddling with the property in connection with the mortgagor assumes the same liabili-

ty as though dealing with a thief. This principle, of course, ignores as wholly immaterial all question of notice. I think the rule which applies to one dealing with a thief should not apply to an innocent person dealing directly with the owner rightfully in possession and without notice. * * *

"I therefore find that defendants received and sold the cattle and accounted to the mortgagor for the proceeds without actual notice of plaintiff's rights, and in good faith as commission merchants. I conclude as a matter of law that in such circumstances defendants are not liable unless the South Dakota statute gives them constructive notice * * * [which it did not, Judge Scott held.]" 10 F.2d 510, at page 512.

The decision of Judge Scott in Drover's governs the case at bar, and supplies us with the rule of law to be applied to it. It may be pointed out that in the usual case in which local law is held inapplicable to a federal suit, it is the United States as plaintiff which profits by the denial of a defense under local law. See, e. g., D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 1943, 315 U.S. 447, 62 S.Ct. 676. But the principle of the application of federal law is not in the least affected thereby. What is sauce for the federal plaintiff as gander ought to be sauce for it when it is the goose.

I therefore conclude that the defendants, auctioneers without notice and innocent of any wrongful intent or of negligence, are not liable to the plaintiff in conversion. With respect to the amount received and retained by the defendants out of the returns of the sales, however, the matter is otherwise. This sum, a commission amounting to $46.79, or 3% of $1526.22, was money received by the defendants for the sale of property owned by the United States and retained by them without authority or permission by the United States. The com-

plaint of the plaintiff states an action for money had and received as to that sum of $46.79, and it is the order of the court that plaintiff have judgment for $46.79 plus interest. Plaintiff's other demands for relief are denied.