[No. 27493.    Department Two.    December 13, 1940.]

JOSEPH MODERIE, *Appellant,* v. ARTHUR SCHMIDT *et al.,* *Respondents.*[1]

[1]Reported in 108 P. (2d) 331.

*Graves, Kizer & Graves* and *J. W. Greenough,* for appellant.

*Randall & Danskin,* for respondents.

ROBINSON, J.—Joe Moderie, a Montana rancher, delivered eighteen head of cattle to R. C. Byers. At the time of the delivery, Moderie and Byers executed the following instrument in triplicate:

"To whom it may concern:

"This will certify that Joe Moderie of Arlee, Montana, is shipping 18 head of cattle to Clark and Snow, Portland, Oregon. Upon arrival of the cattle, $447.15 of the total selling price is to be mailed to Joe Moderie and the balance is to be paid to the drover, R. C. Byers.

"Witnesses:                                      Joe Moderie
  Edgar Grinolds                          R. C. Byers
  W. J. Boyer

"State of Montana ⎰.ss.
  County of Lake   ⎱

"Subscribed and sworn to before me this 5th day of November, 1936.                  Ailsen Jensen
                  "Notary Public for the State of Montana,
(Notarial Seal)      Residing at Arlee, Montana."

Moderie retained one copy, Byers another, and the third was forwarded to Clark and Snow, at Portland. Byers paid Moderie $150 at the time. Byers trucked the cattle to Paradise, Montana, where they were delivered to a railroad company with other cattle, all consigned to Clark and Snow, Portland, by Byers as consignee.

The defendants were doing business at Spokane as livestock commission merchants. Learning of the shipment, they persuaded Byers to divert it to the Spokane stockyards. The cattle were delivered to the defendants at the Old Union Stockyards at Spokane, and by them sold to the Carstens Packing Company. The defendants received the purchase price

and paid it over to Byers, less their commissions and charges, and he absconded.

It is not contended that there was anything irregular or wrongful in the diversion to Spokane. Such diversions were customary in order to take advantage of favorable market conditions; nor is there any contention that the cattle were wilfully converted. The state of Montana maintained at the stockyards a brand inspector, named Bruns, who was familiar with the Montana brands and to whom the commission merchants operating at the stockyards looked for information regarding ownership. It appears that he construed the instrument quoted at the beginning of this opinion as a bill of sale from Moderie to Byers.

Moderie, receiving no money from Clark and Snow, traced the cattle through the railroad company and learned that they had been unloaded at Spokane. Being somewhat hard of hearing, he had a friend telephone the defendants to inquire what had occurred. Shortly after the telephone conversation, the Spokane Livestock Commission, that is, the defendants doing business under that name, wrote the following letter:

"SPOKANE LIVESTOCK COMMISSION Co.
"Bonded for Your          Phones: Lakeview 2780
   Protection                       Lakeview 2715
            Old Union Stock Yards
            Spokane, Washington
            November 17, 1936
"Mr. Joe Maudry
  c/o Heron Lumber Company
  Arlee, Montana
"Dear Friend Joe:
   "Replying to our telephone conversation regarding R. C. Byers of Grangeville, Idaho, will state that he is doing business with the Spokane & Eastern Trust Company here at Spokane.
   "We have had some dealings with him in the past but do not know a great deal about him, only that he

is married and lives at Grangeville, Idaho. He came in here with a load of cattle on a Sunday evening late, and was compelled to feed here. As our market was good while he was here, he decided to sell and turned them over to us.

"Regarding the bill of sale we do not ask for them as it is up to the Montana brand inspector to get them and clear the cattle or hold the proceeds, whichever may be the case according to the information he gets and whether or not they have proper bills of sale to correspond with the cattle. This is about all the information we can give you at this time. Only that I have heard Byers is again in western Montana this week, I am told, but he did not show up here with any stock.

"Hoping you will get this matter straightened out in time without any losses on your part, we remain

"Yours very truly,
"Spokane Livestock Com. Co.
"as mo                    By Art Schmidt, Mgr."

Shortly after, the Spokane Livestock Commission, through E. A. Jones, its "Salesman & Field Mgr.," wrote the plaintiff the following letter:

"Old Union Stock Yards
Spokane, Washington
November 25, 1936

"Mr. Joe Moederie
Arlee
Montana

"Dear Sir:

"In regard to your cattle that were released on a sales contract by Mr. B. Bruns, local inspector for the State of Montana Livestock Commission.

"Mr. Bruns has put in our hands as escrow $447.50 to protect you from subsequent loss on your cattle. We are, with the cooperation of Mr. Bruns and the sheriff of your county, doing everything humanely possible to locate this man, R. C. Byers, and protect ourselves from any loss in this matter.

"We have been advised that you have knowledge

of Byer's disposition of his truck and will appreciate any information you can forward us.

"In view of the protection you have been afforded in this matter, we would appreciate a reasonable extension of time and ask that you direct your correspondence to us, or Mr. Bruns, instead of through the Montana Livestock Commission.

"Yours very truly,
"E. A. Jones."

The plaintiff, pursuant to the request of the last paragraph of the above letter, made no complaint to the Montana livestock commission, but the defendants later redelivered the $447.50 therein mentioned to Bruns.

In this action, the plaintiff sought a recovery of that sum on three theories: Conversion, wrongful violation of escrow, and estoppel. We need consider the first theory only.

In resisting the conversion theory, the defendants contended, first, that the cattle actually belonged to Byers; and second, and in the alternative, that the defendants, constituting, as they did, a "market agency" under the Federal packers and stockyards act of 1921, could not lawfully be held liable for a conversion occurring in making a sale which they were by law required to make, in the absence of any notice of the consignor's defect of title.

The trial court rejected the first contention. We have examined the evidence pertaining to that issue, and we do not find it, to any great degree, inconsistent with the conclusion which one must arrive at from a study of the instrument which is quoted at the beginning of this opinion. In that instrument, both Moderie and Byers certified, under oath, "that Joe Moderie of Arlee, Montana, is shipping 18 head of cattle to Clark and Snow, Portland, Oregon." It was

Moderie, therefore, not Byers, who was shipping the cattle. The instrument further goes on to provide:

"Upon arrival of the cattle, $447.15 of the total selling price is to be mailed to Joe Moderie and the balance is to be paid to the drover, R. C. Byers."

This recognizes that, as to the cattle, Byers bore the relation of a drover, not that of an owner. It further establishes that Byers had no more than a contingent interest in the net proceeds of their sale; for, unless the proceeds exceeded $447.15, he was to receive nothing at all.

■ The court, however, held with the defendants on their alternative contention, saying, in part:

"The Spokane Stockyards, of course, do not compare in magnitude with those of the Twin Cities, Chicago, Kansas City or East Illinois; but the underlying principle must be the same. It seems to me that it would stifle and disrupt all transactions if a commission merchant under this Act were charged with a defect in title of the consignor when he had no knowledge of such defect; that the Federal Act puts a commission merchant operating thereunder on the same basis as a common carrier, and certainly I know of no rule of liability that would affect a common carrier under the same circumstances; that where the defendants, as has been shown in this case, complied with the regulations and the Act in question and did so without knowledge of any imperfections in the title of Byers, they cannot now be held on the theory of conversion."

The trial court's opinion was pronounced before the recent opinion in *Mason City Production Credit Ass'n v. Sig Ellingson & Co.,* 205 Minn. 537, 286 N. W. 713, appeared in the law reports. In this case, the court distinguished the common carrier cases relied on by respondents in this case, and, in discussing the packers and stockyards act, said, in part:

"There is no indication in the history of this legislation nor in the act itself of an intention to shield either

purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or covered by chattel mortgages of which the purchasers or market agencies may be in fact ignorant."

The supreme court of the United States denied a petition for a writ of certiorari (308 U. S. 599, 84 L. Ed. 501, 60 S. Ct. 130), and later, a motion for a rehearing of the petition (308 U. S. 637, 84 L. Ed. 529, 60 S. Ct. 178). We note that the solicitor general of the United States appeared in the supreme court and opposed the granting of the writ. It seems reasonable to infer that the decision of the Minnesota supreme court was satisfactory to the Federal authorities charged with the administration of the packers and stockyards act.

The opinion in the *Ellingson* case has recently been followed in *First Nat. Bank of Pipestone v. Siman,* 289 N. W. (S. D.) 416.

The judgment appealed from is reversed, with directions to enter judgment for the plaintiff.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.