**UNITED STATES of America,
Appellant,**

**v.**

**Henry W. MATTHEWS and Nettie. Matthews, Doing Business Under the Firm Name and Style of Yuba Livestock Auction Company, Appellees.**

**No. 15245.**

United States Court of Appeals
Ninth ·Circuit.

May 13, 1957.

George Cochran Doub, Asst. Atty. Gen., Samuel D. Slade, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for appellant.

Weis & Weis, Alvin Weis, Yuba City. Cal., for appellees.

Before STEPHENS, POPE and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Some readers of a comparatively recent Supreme Court decision may discern a trace of nostalgia· for Swift

v. Tyson [1] and its holding that state law should govern Federal courts only in matters "strictly local", and not as "to question of a more general nature".

Be that as it may, almost exactly one hundred years after Swift, in a case involving a fraudulently cashed Government check, the Supreme Court said:

"In our choice of the applicable federal rule we have occasionally selected state law. [Case cited.] But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. *The desirability of a uniform rule is plain. And while the federal law merchant developed for about a century under the regime of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, represented general commercial law rather than a choice of a federal rule designed to protect a federal right, it nevertheless stands as a convenient source of reference for fashioning federal rules applicable to these federal questions."* [Emphasis supplied.] [2]

As Professor Arthur E. Sutherland, of Harvard University, has observed in an article in the Stanford Law Review of December, 1955: [3]

"But the national economy has come to be largely unitary. Purchases and sales do not neatly divide into two classes, those purely local and those involving more states than one. Transportation between two points within a state affects transportation across state boundaries. The production of goods within a state affects the market for goods coming from outside. In the late 1930's and the early 1940's Robert Jackson, as a lawyer for the Government and as a Justice of the Supreme Court, had much to do with establishing the doctrine that in the commerce clause there are no discernible limits to the legislative power of the national government."

The "federal question" here before us is whether, under the Farmers' Home Administration Act of 1946, hereinafter "the Act", [4] the appellees are liable in conversion for the full value of the mortgaged livestock here involved, less any amount refunded to the appellant out of the proceeds of the sales.

1. *Statement of Facts*

With the exception of the appellant's assertion that the chattel mortgagor's "debt to appellant is still due and owing in a sum exceeding $1,526.22, and cannot be satisfied out of [the mortgagor's] current assets", the appellees accept the appellant's statement of facts. Omitting any reference to the amount that the mortgagor now owes the appellant and to the ability of the mortgagor to respond out of his current assets, both of which matters will be discussed *infra*, we accordingly adopt as our own the rest of appellant's statement of facts.

On March 17, 1951, one Wheaton executed a crop and chattel mortgage in favor of the Farmers' Home Administration, an agency of the United States, on certain of his farm chattels, including the livestock which are the subject of this suit, which also includes after-acquired livestock. The mortgage, which represented security for a Production and Subsistence loan extended by the

1. 16 Pet. 1, 41 U.S. 1, 16, 10 L.Ed. 865.

2. Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838.

3. Volume 8, Number 1: "Mr. Justice Jackson: The Nation's Economy and State Frontiers".

4. 7 U.S.C.A. §§ 1001 et seq.

Farmers' Home Administration to Wheaton, contained the customary provision that the mortgagor was not to sell any of the mortgaged property without first obtaining the consent of the mortgagee. It further provided that, upon the failure of the mortgagor to perform any of the covenants of the mortgage, the mortgagee was to become entitled to immediate possession of the mortgaged property. On the date of execution, the mortgage was duly recorded in Yuba County, California, the county in which Wheaton then resided and in which the mortgaged property was then located.

Despite his obligation not to do so between November 19, 1951, and March 2, 1953, Wheaton, without the consent or knowledge of appellant, periodically removed certain of the mortgaged livestock to adjoining Sutter County, California. The livestock was there delivered to appellees for sale by them at auction in the regular course of business. On each occasion, Wheaton warranted in writing that the animals delivered to appellees were free and clear of all liens and other encumbrances. Appellees did not have actual knowledge of the existence of the Farmers' Home Administration mortgage.

Upon each sale, appellees turned the proceeds (which totalled $1,526.22) less their customary 3% commission (which totalled $46.79) over to Wheaton.

On September 30, 1954, this action was brought in conversion against appellees to recover the reasonable market value of the sold livestock, i. e., the price which had been received at auction. On February 29, 1956, the District Court filed its memorandum opinion holding that appellant was entitled to recover from appellees only the commission which the latter had withheld. Recognizing that, under California law, appellees would be liable to appellant for the full market value of the livestock, the court determined that federal law governed. Relying on the decision of the United States District Court for the Northern District of Iowa in Drovers' Cattle Loan & Investment Co. v. Rice, 10 F.2d 510, the court then ruled that under federal law a commission merchant is liable to the mortgagee in these circumstances solely for that portion of the proceeds of the sale which is retained by him.

On May 11, 1956, judgment was entered in favor of appellant in the amount of $46.79. This appeal followed.

2. *The District Court Correctly Held That the Liability of the Appellees Is Governed by Federal Law.*

The District Court held [139 F.Supp. 688] that "the law governing plaintiff's action is the common law prevailing in the federal courts when no choice of state law is indicated by Congress", citing the Clearfield Trust Co. case, supra.

The appellant agrees with that holding, asserting that "In the absence of an express statutory provision to the contrary, Federal law governs the rights and liabilities of the United States in the administration of programs of this character".

The appellees, too, concur in the view that "the case should be decided in accordance with Federal rather than local law."

Despite this complete unanimity on the rule of decision, however, the appellant has seen fit to devote more than a third of its brief to laboring the point. We have already indicated our views on the subject, and we do not believe that any useful purpose will be served by further elaborating this self-evident and completely accepted proposition.

■ We simply hold that Federal law governs the rights and liabilities of the parties.

■ 3. *The Weight of Federal Authority Imposes Liability on Livestock Commission Merchants in Situations Like the One at Bar.*

We have seen that the Clearfield Trust Co. case, supra, teaches that general commercial law "stands as a convenient source of reference for fashioning feder-

al rules applicable to these federal questions".

Citing many authorities in support of its position, the Court of Appeals for the Tenth Circuit, in United States v. Butt, 10 Cir., 1953, 203 F.2d 643, 644–645, said:

> "The United States is the owner of the mortgage in question. Generally, a mortgagee who has suffered a loss may maintain an action against a person who has wrongfully converted to his own use property included in the mortgage which has been duly filed for record."

Referring to the rule "that a broker, factor, or commission merchant cannot escape liability for the wrongful sale of property", in Birmingham v. Rice Brothers, 1947, 238 Iowa 410, 26 N.W.2d 39, 42, 2 A.L.R.2d 1108, 1115–1116, the Supreme Court of Iowa used the following language:

> "The factor, *even though innocent* [as in the case at bar], is liable if he assists in such conversion, because he stands in the shoes of his principal. The liability of both principal and factor is based, not upon contract, but upon tort." [Emphasis supplied.][5]

In their brief, the appellees repeatedly insist that "Wheaton's debt \* \* \* could have been satisfied out of Wheaton's remaining personal property subject to the mortgage". They assert that "Not unless and until the Government shall have foreclosed its mortgage *and actually sustained some loss after realizing on its remaining security*, should any thought be given to holding Appellees for any damages resulting to the Government from the sales of livestock involved herein." [Emphasis supplied.]

In making these statements the appellees have fallen into serious error. The mortgagee need *not* first establish that, like a honey-bee, he has flitted from security flower to security flower, and still has not been able to collect sufficient property pollen to satisfy his hunger.

In Bank of Havelock v. Western Union Telegraph Co., 8 Cir., 1905, 141 F. 522, 526, a leading case that seems to have escaped the notice of counsel, Judge Sanborn used the following language:

> "Nor can the defendant escape judgment for the loss inflicted because the plaintiffs have other security sufficient to satisfy their claim against the mortgagor. They had the right, as against the telegraph company, to *all* the security which they had obtained, and the depreciation or abstraction of any part of it by the latter was wrongful. It does not lie in the mouth of the telegraph company, after it has depreciated the security of the plaintiff's $3,500, to say that it is not liable to make compensation for the loss because the plaintiffs have the power to inflict it upon the mortgagor. *It is no answer to a suit by a mortgagee against a stranger for the removal of timber or houses or other valuable property from mortgaged lands, or for the conversion of mortgaged chattels, that the claim of the mortgagee is amply secured without the timber or houses taken or the chattels converted.* And it is no defense to an action by a mortgagee for the loss of security caused by false representations that the plaintiff's claim is amply secured, notwithstanding the loss. A mortgagee is entitled to recover of a wrongdoer the value of the mortgaged property he has taken from the lien of the mortgage, although that lien still holds sufficient to secure the debt, and he is not required to inflict the loss upon the mortgagor. [Cases cited.]" [Emphasis supplied.]

And in 10 Am. Jur., Chattel Mortgages, §§ 176 and 178, pages 832 and 833–834, the rule is thus stated:

---

5. See also Citizens State Bank of Dalhart v. Farmers Union Livestock Co-op. Co., Kan., 1948, 165 Kan. 96, 193 P.2d 636, 644.

"§ 176.—*By Mortgagee.*—Generally speaking, the mortgagee has a right of action against any one who interferes with his right or impairs his security. His right to recover for an unlawful interference or intermeddling with the mortgaged property exists as well when the property is taken by an officer under color of legal process as when it is taken without color of authority of law, and is not affected *by the fact that the mortgagor has other property included in the mortgage to which the mortgagee could resort.* * * *

"§ 178—*For Conversion.*—It is well settled that a chattel mortgagee in possession of the mortgaged chattels or having a present right of possession may maintain an action in the nature of trover against a wrongdoer for the conversion of the mortgaged property. * * * Nor is it necessary in an action against one who purchased a part of the property embraced in a chattel mortgage that the plaintiff show that the *other property embraced in the mortgage was insufficient to satisfy the indebtedness. If the mortgagee has actually reduced his indebtedness by application of other property, this may be shown by the purchaser in partial defense, but the mere ability to satisfy the debt out of other property is not a defense.*"
[Emphasis supplied.]

Finally, in 2 Jones on Chattel Mortgages and Conditional Sales, 1933 edition, § 460, pages 229–230, the rule is thus stated:

"An absolute sale of the mortgaged property by the mortgagor or anyone claiming under him, in exclusion of the rights of the mortgagee, is a conversion of it for which the mortgagee may maintain trover. * * * If a mortgagor, for the purpose of defrauding the mortgagee, sends the mortgaged goods to an auctioneer, by whom they are sold, and the proceeds paid over to the mortgagor, the mortgagee may maintain trover against the auctioneer, although the latter did not participate in the fraud and had no knowledge of the existence of the mortgage * * *. A commission merchant is under the same liability in this respect as an auctioneer. Although he sells mortgaged property without any notice of a duly recorded mortgage, he is liable in tort for conversion to the mortgagee."

4. *The Packers and Stockyards Act, 1921, Does Not Help the Appellees.*

The appellees rely heavily upon the case of Blackwell v. Laird, 1942, 236 Mo. App. 1217, 163 S.W.2d 91, involving an action by a "livestock commission company" to recover the value of cattle allegedly stolen from the plaintiff by a farm hand, and sold to livestock traders who consigned the cattle to the defendants. From a judgment in favor of the defendants, the plaintiff appealed. The respondents defended on the ground that under the Packers and Stockyards Act, 1921, 7 U.S.C.A. § 181 et seq., they were required to render market service to all persons applying therefor, and promptly to receive and sell for a commission, without discrimination, all livestock consigned to them for sale, etc.

The sole question presented was whether the respondents, as sellers of stolen cattle, were liable to the appellant in that case, as owner, for the value of the livestock, even though the respondents had no notice or knowledge of the appellant's interest in the cattle. The judgment was affirmed.

We do not think that Blackwell was correctly decided, and we decline to follow it.

In § 205 of 7 U.S.C.A. the Packers and Stockyards Act provides:

"It shall be the duty of every stockyard owner and market agency to furnish upon *reasonable* request, without discrimination, *reasonable* stockyard services * * *. [Emphasis supplied.]

Construing the Act, the Supreme Court, in Stafford v. Wallace, 1922, 258 U.S. 495, 515, 42 S.Ct. 397, 401, 66 L.Ed. 735, with Chief Justice Taft delivering the opinion, has used the following language:

"Another evil, which [Congress] sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect of prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management *and the commission men,* on the one hand, and the packers and dealers, on the other." [Emphasis supplied.]

Turning its attention particularly to § 205, supra, the Supreme Court of Iowa, in Birmingham v. Rice, supra, 238 Iowa at page 417, 26 N.W.2d at page 43, 2 A.L.R.2d at page 1117, observed:

"Certainly, Congress did not adopt the Packers and Stockyards Act to encourage and protect the operation of fences for handling property stolen or procured by fraud. The Act merely makes it the duty of such agencies to furnish upon *reasonable request without discrimination* reasonable stockyards services. It is not wrongful discrimination to refuse to aid a criminal in his crime, nor is a request that one dispose of property fraudulently procured or stolen a *reasonable request.*"

In Moderie v. Schmidt, 1940, 6 Wash. 2d 592, 108 P.2d 331, 334, the trial court had expressed the view that "it would stifle and disrupt all transactions if a commission merchant under this Act were charged with a defect in title of the consignor when he had no knowledge of such defect". The Supreme Court of Washington, however, disagreed, saying:

"The trial court's opinion was pronounced before the recent opinion in Mason City Production Credit Ass'n v. Sig Ellingson & Co., 205 Minn. 537, 286 N.W. 713, 716, appeared in the law reports. In this case, the court distinguished the common carrier cases relied on by respondents in this case, and, in discussing the Packers and Stockyards Act, said, in part: ' * * * There is no indication in the history of this legislation nor in the act itself of an intention to shield either purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or covered *by chattel mortgages of which the purchasers or market agencies may be in fact ignorant.* * * *'

"The Supreme Court of the United States denied a petition for a writ of certiorari (308 U.S. 599, 60 S.Ct. 130, 84 L.Ed. 501), and later, a motion for a rehearing of the petition (308 U.S. 637, 60 S.Ct. 178, 84 L.Ed. 529). We note that the solicitor general of the United States appeared in the Supreme Court and opposed the granting of the writ. It seems reasonable to infer that the decision of the Minnesota Supreme Court was satisfactory to the federal authorities charged with the administration of the Packers and Stockyards Act.

"The opinion in the Ellingson case has recently been followed in First National Bank of Pipestone v. Siman, [67 S.D. 118] 289 N.W. 416.

"The judgment appealed from is reversed, with directions to enter judgment for the plaintiff." [Emphasis supplied.]

We hold that the Packers and Stockyards Act does not absolve the appellees from liability to the appellant for the reasonable market value of the sold livestock, even though the appellees had no knowledge of the appellant's chattel mortgage on such livestock.

**5.** *The United States District Court Case Relied Upon by the Court Below Is Contrary to the Weight of Authority.*

The lone District Court case upon which the trial judge based his opinion [139 F.Supp. 690] "that the [appellees], auctioneers without notice * * * are not liable to the [appellant] in conversion", was Drovers' Cattle Loan & Investment Co. v. Rice, D.C.Iowa, 1926, 10 F.2d 510, 512. In that case the District Court, in considering, in the language of the Court below, "the innocent sale of mortgaged cattle by an auctioneer, * * * concluded that the rule of Frizzell v. Rundle [88 Tenn. 396, 12 S.W. 918, 17 Am.St.Rep. 908], rejecting the auctioneer's liability, was the better rule." The Court below, after reviewing the above cases, and other authorities, concluded that the Drovers' case "governs the case at bar".

We do not agree. We have already shown that the weight of authority is strongly against Drovers', Frizzell, and the opinion below. We need labor the point no further.

**6.** *It makes No Difference Whether Fritz Ruff Had a Senior Lien on Some Or Even All of the Hogs Sold by the Appellees.*

In their brief, the appellees point out that after Wheaton executed the mortgage to the appellant, "he bought from one Fritz Ruff one hundred twenty hogs * * * and mortgaged them back to Mr. Ruff". It is further stated that "Wheaton took the Ruff hogs to his ranch in Yuba County and commingled them with the hogs already there"; that "Subsequently to the Ruff deal he acquired from some other source another herd of forty-two hogs * * *, and brought them to his said ranch, where they likewise were commingled with the hogs already there". From these facts the appellees evolve the following argument:

" * * * Appellees could not have determined by the most searching scrutiny of the recorded mortgages whether the hogs presented

for sale [to the appellees] were Ruff's hogs or the Government's hogs."

If we assume that the appellees' view regarding the hopeless commingling is correct; if we further assume that Ruff's purchase-money mortgage was superior to the lien created by the previously recorded mortgage of the appellant; and, finally, if we assume that Ruff's prior lien covered all of the hogs sold by the appellees, the appellees' situation still is not improved.

The appellees recognize that Ruff's vendor's lien did not destroy the appellant's lien: they merely contend that Ruff's lien takes "first position". But Ruff is not here complaining; and, in the language of the day, it is none of the appellees' business whether Ruff's lien is superior or inferior to that of the appellant.

■ It is well settled that one who exercises, even innocently, improper dominion, as the appellees have done, over property that is subject to a valid lien, is not to be heard to say that the property is also subject to a prior lien of a third party. In other words, the junior lienor may maintain an action in conversion if he has the right of immediate possession of the property as against any one except the senior leinor and his privies.

In Moore v. Prentiss Tool & Supply Co., 1894, 133 N.Y. 144, 30 N.E. 736, after both the first and the second chattel mortgages had been executed, the mortgagor made a bill of sale of the mortgaged chattels to the defendant, to whom he transferred the physical possession of the chattels. The plaintiff held the second mortgage, which had become due and had not been paid. At the time of the alleged conversion of the property by the defendant, and of the commencement of the action, the first mortgage had not become due.

The plaintiff foreclosed on the second mortgage, and demanded of the defendant possession of the property. When this was refused, the plaintiff com-

menced an action, as in the instant case, for *conversion*.

With such a situation before it, the Court of Appeals of New York said:

"After default in the payment of the plaintiff's mortgage, whatever title the mortgagor had was vested absolutely, subject to the right of redemption in equity, in the plaintiff; and thereafter the plaintiff had the same right to sue for a *conversion* of the property, or an injury to it, as the mortgagor would have possessed if there had been no default in the payment. Looking at the substance rather than the form of the matter, we think that a second mortgagee, thus situated, can maintain an action for *conversion*." [Emphasis supplied.]

We hold that Ruff's purchase-money lien on the hogs does not preclude the appellant, even if its lien is junior to Ruff's from maintaining an action of conversion against the auctioneer who sold the livestock in the regular course of its business.

### 7. Conclusion

In summary, we hold that the Court below was correct in its holding that the liability of the appellees is governed by Federal law; that the weight of authority, both State and Federal, imposes liability on auctioneers and livestock commission merchants in situations like the one here confronting us; that the Packers and Stockyards Act contains no provision relieving the appellees of responsibility; that the single United States District Court case relied upon by the trial judge is contrary to the weight of authority; and finally, that it is immaterial whether Ruff had a superior lien on some or even all of the hogs sold by the appellees, since Ruff is not here complaining and the appellant's lien is unquestionably valid—effective as to the whole world except the alleged senior lienor.

The appellant concedes that, after the complaint was filed in the court below, Wheaton made restitution to the appellant in the amount of $280.92, representing the net sales price of a cow, subject to the mortgage.

The appellees claim that three payments to the appellant have been made by them. One was duly credited to the appellees' account, although in their brief they erroneously state that it was credited to Wheaton's account. A second check was lost and the appellees claim that a duplicate was delivered. A third check, according to the appellees, had not been returned through bank channels at the time of the trial, approximately one year later, "nor is there any recognizable evidence that it has been credited to Wheaton's account".

The judgment is vacated and the cause is remanded with instructions to enter judgment for the appellant for the full market value of the livestock that the appellees sold without the consent of the mortgagee Farmers' Home Administration, less any amount that Wheaton and the appellees may have refunded to the appellant out of the proceeds of the sales.

Vacated and remanded, with instructions.

POPE, Circuit Judge (concurring specially).

I agree that appellant should have judgment. In United States v. Kramel, 234 F.2d 577, the Eighth Circuit held that state law governs in a case like this. The present case does not require a decision in conflict with that one, for if state law governs the California law makes appellee liable, and if federal law governs, it also requires judgment for appellant as Judge Lemmon properly concludes. Since the federal and the state law are the same we need not decide between them.