**UNITED STATES of America,
Appellant,**

v.

**McCLESKEY MILLS, INC., Appellee.**

**No. 25966.**

United States Court of Appeals
Fifth Circuit.
April 2, 1969.

---

Floyd M. Buford, U. S. Atty., Walker P. Johnson, Jr., Asst. U. S. Atty., Macon, Ga., Edwin L. Weisl, Jr., Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., for appellant.

William E. Smith, Americus, Ga., for appellee.

Before WISDOM and AINSWORTH, Circuit Judges, and JOHNSON, District Judge.

WISDOM, Circuit Judge:

The United States, as a creditor through the Farmers Home Administration, seeks to enforce a security interest in certain peanuts the debtor sold to McCleskey Mills. The United States asserts that the stakes in this case are not just peanuts, since the principal problem concerns the applicability of federal common law. McCleskey Mills asserts that Georgia law applies. We must decline the invitation to explore the fascinating region of federal common law.[1] The federal and state systems dictate a common result. McCleskey Mills is liable in conversion under the Commercial Code, Ga.Code Ann. § 109A–9–306(2).

Federal jurisdiction rests upon Title 28, U.S.C. § 1345.[2]

The facts are stipulated. McCleskey Mills, with its principal place of business in Sumter County, Georgia, buys and sells farm products. It supplies credit in the form of cash and supplies to the farmers with whom it deals. In December 1963 McCleskey Mills made the first of several advances to Steve Smith, a farmer in Lee County, Georgia. These advances were unsecured. The Farmers Home Administration (FHA), an agency of the United States government, also lent money to Smith, as it is authorized to do under the Bankhead-Jones Farm Tenant Act.[3] On February 5, 1964, Smith executed a security agreement in favor of the FHA covering, among other things, his peanut crop for 1964. The FHA recorded its lien on the same day in Lee County Superior Court. Nonetheless, in October 1964, Smith conveyed about 12,000 pounds of his crop to McCleskey Mills, to be credited against his account. Smith assured McCleskey that the crop was free of incumbrances and the company, at the time of the conveyance, lacked actual knowledge of the FHA's security interest. McCleskey later resold the peanuts. The Government brought this action on the theory of wrongful conversion; it seeks to recover the value of the peanuts bought and resold by McCleskey. The court below held that Georgia law, rather than federal law, controls, and that McCleskey's undisputed good faith in buying the peanuts precludes recovery by the Government.

---

1. See Friendly, In Praise of Erie—And of the New Federal Common Law, 39 N.Y. U.L.Rev. 383 (1964).

2. "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits, or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

3. Now 7 U.S.C. § 1941 et seq.

Six Courts of Appeals have already decided almost precisely the same case as is presented here.[4] All have approached it as a choice-of-law question, with four choosing federal law, and two choosing state law.[5] Under the "federal rule" actual innocence of a perfected security interest is no defense to a claim of conversion. One who buys chattels is on notice that the Government has a security interest in them, if the security agreement has been properly executed and recorded. That rule has been upheld unanimously as the federal rule by the other Courts of Appeals that have ruled upon the issue.[6] Even the courts that hold in favor of state law in this area do not dispute the substance of the federal rule put forward by the Government.[7]

McCleskey contends, however, that Georgia precedents require that a buyer know that the goods were previously mortgaged in order to be liable to the mortgagee. McCleskey cites two decisions, De Vaughn v. Harris, 1897, 103 Ga. 102, 29 S.E. 613, and Wynne & Son v. Paulk, 1925, 34 Ga.App. 288, 129 S.E. 288.[8]

What McCleskey Mills fails to point out, however, is that Georgia has been operating under the Uniform Commercial Code since January 1, 1964,[9] a date prior to the events relevant to this litigation, and subsequent to the state-court decisions noted above.

Under the scheme imposed by Article Nine of the Code, the United States obtained a perfected security interest in Steve Smith's 1964 peanut crop on February 5, 1964, the day that it filed its financing statement, or whenever the crop was planted thereafter, whichever came last.[10] That perfected security interest would not, it is true, withstand challenge by most "buyer[s] in ordinary course of business". Such buyers, under Ga.Code Ann. § 109A–9–307(1) take free of previously perfected security interests, for the sake of untrammeled commercial dealing. Section 109A–9–307(1) specifically excepts from that exalted class of buyers in the ordinary course of business, however, "a person buying farm products from a person engaged in farming operations". It can hardly be denied that McCleskey Mills

4. Cassidy Commission Co. v. United States, 10 Cir. 1967, 387 F.2d 875; United States v. Carson, 6 Cir. 1967, 372 F.2d 429; United States v. Sommerville, 3 Cir. 1963, 324 F.2d 712; United States v. Union Livestock Co., 4 Cir. 1962, 298 F.2d 755, 96 A.L.R.2d 199; United States v. Matthews, 9 Cir. 1957, 244 F.2d 626; United States v. Kramel, 8 Cir. 1956, 234 F.2d 577. All of these cases involved suits by the Government as the secured party against auctioneers who had sold livestock received from the Government's debtors.

5. The Ninth, Third, Sixth, and Tenth Circuits ruled in favor of federal law. The Eighth and Fourth chose state law.

6. See the cases cited in note 4, *supra.*

7. See United States v. Union Livestock Co., *supra*, and United States v. Kramel, *supra.*

8. In *De Vaughn* the Supreme Court of Georgia held that it was "error in the court to charge the jury that, if the junior mortgage had constructive notice of the mortgage, he would be liable,

whether he had actual notice or not. A creditor who, ignorant of the existence of a lien upon property, takes it in good faith, and in the regular course of his business sends it out of the jurisdiction of the court, or otherwise disposes of it so that it cannot be seized under execution for the sole purpose of advancing his own interest, and with no intention to defeat the right of other people in the property, should not be held liable in damages for such conduct simply because a lien upon this property is duly registered."

9. The Code was adopted by Act 1962, p. 156 et seq., approved February 27, 1962. Section 109A–10–101 originally provided: "This Act shall become effective at midnight on April 1, 1963, following its enactment. It applies to transactions entered into and events occurring after that date." The Code was amended by Arts. 1963, p. 188, postponing the effective date until January 1, 1964. See Section 109A–10–101.

10. Ga.Code Ann. § 109A–9–204(1) and § 109A–9–204(2) (a).

here fits the description of the excluded class of buyers. McCleskey cannot therefore invoke the strong protection afforded a buyer in the ordinary course of business.

Since § 109A–9–307 has no application in this case, we are thrown back upon the residual provision, § 109A–9–306(2):

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition by the debtor, unless his action was authorized by the secured party in the security agreement or otherwise.

The authors' official comment upon this section of the Code makes it clear that the secured party may in such cases maintain an action for conversion against the subsequent purchaser.[11] This principle underlies the effective operation of any recording system: subsequent transferees, unless they are entitled to special protection, must be on notice of any recorded and hostile interest in the land or chattels they receive. Subjective innocence will not ward off liability. Since the Code makes no exceptions for buyers such as McCleskey Mills, and since the Government had perfected its security interest prior to the purchase from Smith by McCleskey, "the secured party * * * [has] the right to follow collateral into the hands of good faith purchasers for value and to have whatever recovery, by an action in replevin or conversion the law of the relevant state may allow". 2 Gilmore, Security Interests in Personal Property 714 (1965). See Clovis National Bank v. Thomas, 1967, 77 N.M. 554, 425 P.2d 726; United States v. Sommerville, 3 Cir. 1963, 324 F.2d 712, concurring opinion of Steele, J.

The decision of the district court is accordingly reversed and remanded for further proceedings consistent with this opinion.

---

11. Comment 3 reads, in part: "In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule. The secured party may claim both proceeds and collateral, but may of course have only one satisfaction."