**UNITED STATES of America,
Plaintiff,**

v.

**PETE BROWN ENTERPRISES, INC.,
Defendant.**

**No. WC 7038–K.**

United States District Court,
N. D. Mississippi, W. D.

June 28, 1971.

Norman L. Gillespie, Asst. U. S. Atty., Oxford, Miss., for plaintiff.

John S. Throop, Jr., Water Valley, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this action brought under 28 U.S.C. § 1345, the United States, plaintiff, sues Pete Brown Enterprises, Inc., a corporation domiciled at Water Valley, Mississippi, defendant, to recover damages for conversion. The complaint seeks a judgment for $2,487.50, plus accrued interest, for poultry allegedly subject to a lien held by the government and purchased by defendant. Upon the basis of stipulated facts, affidavits and supporting documents, the government has moved for summary judgment in its favor. Following submission of briefs, the case is now ready for decision.

For reasons that follow, we conclude from the evidentiary materials submitted that there is no genuine dispute as to any material fact, and plaintiff is entitled to prevail as a matter of law. Therefore, plaintiff's motion for summary judgment should be sustained.

Robert Patterson and Maybell Patterson, husband and wife, were low-income rural residents of Clay County, North Carolina, RFD, Route 3, Hayesville. They obtained on July 8, 1966, their first loan from Farmers Home Administration (FHA) for $2,500 to construct and equip a poultry house; and on January 4, 1967, a second FHA loan of $1,000, was made them for erecting and equipping an additional poultry house. Both houses were placed on the borrowers' small farm located about 14 miles east of Hayesville. On September 11, 1967, FHA loaned $6,-000 to the Pattersons for the purpose of feeding an original poultry flock of 3000 baby chicks and cockerels which they obtained from a Georgia hatchery. These

three FHA loans, evidenced by promissory notes last maturing November 15, 1968, were covered by a Financing Statement and secured by a Security Agreement dated September 11, 1967. The financing statement which on September 19, 1967, was filed for record with the Register of Deeds of Clay County, North Carolina, covered livestock as collateral and provided that disposition of the collateral was not authorized. A separate security agreement, which was not filed for record, recited that it was to secure the payment of the three described promissory notes and any additional FHA loans to the borrowers, and gave FHA a security interest in the following property:

"All livestock (except poultry kept primarily for subsistence purposes), fish, supplies and other farm products now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to the following:

| Quantity | Kind-sex | Breed | Color | Weight or average weight | Age or age range |
|---|---|---|---|---|---|
| 1 | Mare Mule | Native | Black | 1000#s | 6 yrs. |
| 1 | Boar | OIC | White | 350#s | 3 mos. |
| 2 | Brood Sows | Duroc & OIC crossed | Multi colors | 300#s | 2–3 yrs. |
| 3000 | Pullets | Arbor Acres | White | 1# | 1 mo. |

Except 4 feeder pigs."

---

The security agreement expressly provided that the Pattersons could not sell or dispose of the collateral without prior written consent of FHA.

By September 1968 the initial 3000 chickens were approaching the end of their egg production cycle, thus necessitating their sale at an early date and replacement with young poultry. Accordingly the Pattersons on September 6, 1968, obtained yet another FHA loan, this time for $8,000, to feed out 6000 baby chicks which were immediately acquired from the same Georgia hatchery. This $8,000 loan was represented by the borrowers' note providing for payments of $3,000 on May 1, 1969, and $5,000 on January 15, 1970. When the original chickens completed their egg laying career in November 1968, the Pattersons sold them and accounted to FHA for the proceeds. At this time the replacement flock was only two months old. FHA did not take an additional financing statement or security agreement. The borrowers on September 23, 1968, paid their $6,000 note dated September 11, 1967, thus retiring their obligation for the original flock. The replacement flock remained on the Patterson farm and completed its egg production cycle in the fall of 1969.

The Pattersons, without FHA's consent or permission, on November 27, 1969, sold all their chickens to defendant, a poultry processor regularly engaged in buying live chickens for slaughter in a multi-state area. Defendant paid $3,487.50 for the purchase, consisting of 16,500 pounds of heavy hens and 1,750 pounds of roosters. Defendant did not inquire at the courthouse about possible liens against the flock, and the Pattersons did not inform it of the encumbrance. The sale price was paid by check to Robert Patterson, who subsequently remitted only $1,000 of the proceeds to FHA. After applying this and all other credits, the Pattersons still owed FHA $4,684.80 principal and accrued interest.

On December 22, 1969, FHA discovered the unauthorized sale of the chickens, notified defendant of its claim, and

accelerated the due date of the debt and demanded full payment from the Pattersons. The Pattersons failed to respond. Robert Patterson on February 4, 1970, filed a petition in bankruptcy in the United States District Court for the Western District of North Carolina, listing assets of $500 and liabilities of $21,744.45.[1] FHA made a determination that the bankruptcy was a "no-asset" case, without prospects of collection, and therefore did not file a claim. Robert Patterson on August 24, 1970, died intestate, being survived by his widow, Maybell Patterson, and nine children, including four dependent minors. Mrs. Patterson had no separate estate of her own, and she and her surviving minor children inherited nothing from Robert Patterson and are destitute, living under poverty conditions. There is no prospect that FHA may make further collection of any money from the bankrupt's estate, the decedent's estate, or the widow.

The agreed value of the chickens purchased by defendant was $3,487.50. They were, upon their purchase, immediately trucked out of North Carolina, slaughtered, and disposed of by defendant in the normal course of its processing business.

Defendant relies upon two affirmative defenses: (a) the chickens which it purchased were not the same chickens described in the security agreement, that it was a protected buyer, and the government has no valid lien upon which to base this action; (b) even if its lien were effective, plaintiff failed to proceed against the other collateral subject to the security agreement and failed to pursue its claim against Robert Patterson, or his estate, and Maybell Patterson by exhausting all remedies available, thus precluding plaintiff, because of laches, from asserting its conversion claim against an innocent purchaser for value.

Sympathies aside, we are compelled by the law of North Carolina, which here controls, to declare these contentions to be without merit. Like most states, North Carolina, by Chapter 25 of its General Statutes, has adopted the Uniform Commercial Code, which went into effect in that jurisdiction July 1, 1967. That Act provides for the standard documents to effectuate valid secured transactions.

In this case FHA utilized a financing statement, in the statutorily prescribed form (N.C.G.S. § 25-9-402), which was duly executed and filed with the Register of Deeds of the county of the Pattersons' residence (N.C.G.S. § 25-9-401(1) (a)). Since the financing statement did not state a maturity date of the obligation it secured, it was effective for a period of five years from the date of its filing, or until September 18, 1972 (N.C.G.S. § 25-9-403). The filed statement, which recited that it covered the "crops, livestock and other farm products" as collateral, forbade the borrowers from disposing of the collateral. We have no need to consider whether chickens are embraced within the term "crops, livestock and other farm products." By statutory definition, goods are "farm products if they are crops or livestock * * * used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, woolclip, maple syrup, milk and *eggs*)." (N.C.G.S. § 25-9-109). Official comment to paragraph 4 of this section notes that the term "livestock" obviously includes fowl since eggs are referred to as the product of livestock.

The security agreement, which was also on a prescribed form, was effective according to its terms between the parties, against purchasers of the collateral, and against creditors (N.C.G.S. § 25-9-201). As noted, this agreement, together with the filed financing statement, vested in plaintiff a perfected security interest in all of borrowers' livestock, includ-

---

1. These liabilities included indebtedness owing to a bank in Hayesville, which apparently made loans to borrowers against chickens under financing statements filed for record on January 11, October 17, and December 23, 1968, respectively, all of which were, of course, subsequent to the filing date of the FHA financing statement.

ing poultry, whether presently owned or thereafter acquired, and all "increases, replacements, substitutions, and additions thereto." N.C.G.S. § 25–9–204(3) expressly provides that collateral, whenever acquired, shall secure all obligations where the security agreement so provides, as in this case.

Since FHA's loan documents complied with the North Carolina statutes, it is clear that they created a perfected security interest in the second flock of chickens acquired by the Pattersons to replace the original layers, and this security interest was effective against a purchaser of the collateral who was necessarily charged with constructive notice of the public records. Furthermore, this perfected security interest, by N.C.G.S. § 25–9–306(2), continues in the collateral notwithstanding its sale or disposition by the debtor.[2] It is settled that the secured party may maintain an action for conversion against the subsequent purchaser. As stated in United States v. McCleskey Mills, Inc., 409 F.2d 1216, at 1219 (5 Cir. 1969, applying Georgia law):

> "This principle underlies the effective operation of any recording system: subsequent transferees, unless they are entitled to special protection, must be on notice of any recorded and hostile interest in the land or chattels they receive. Subjective innocence will not ward off liability."

■ The defendant, nevertheless, claims that it should have special protection against the reach of the perfected security interest by asserting, first, that the replacement chickens were "consumer goods", and second, that defendant was "a buyer in the ordinary course of business." Express provisions of the Code invalidate both contentions.

While ordinarily no security interest attaches "under an after-acquired property clause to consumer goods * * * unless the debtor acquires rights in them within 10 days after the secured party gives value," [3] (N.C.G.S. § 25–9–204), defendant can derive no comfort from the statutory definition of "consumer goods" as only goods "used or bought for use primarily for personal, family or household purposes." N.C.G.S. § 25–9–109. We agree with the government's argument that a large flock of chickens owned by a farmer raising them for the market may not be considered as consumer goods, or other than as farm products in the hands of the debtor. Moreover, the defendant certainly did not buy the chickens for personal, family or household purposes but as a processor buying large quantities of poultry for commercial slaughter. Thus, the special limitation on after-acquired property as it relates to consumer goods is not here applicable.

■ Nor may defendant qualify itself as a buyer in the ordinary course of business,[4] for the reason that when it purchased the chickens from the Pattersons it bought "farm products from a person engaged in farming operations," and sub-

2. Official comment No. 3 to § 25–9–306 (2):

> "3. In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion. Subsection (2) codifies this rule. The secured party may claim both proceeds and collateral, but may of course have only one satisfaction."

3. It is not clear from plaintiff's affidavits whether the replacement baby chicks were acquired by the Pattersons within 10 days after FHA advanced its $8,000 loan evidenced by promissory note dated September 16, 1968.

4. N.C.G.S. § 25–1–201(9) provides in part:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker."

ject to a perfected security interest. N.C.G.S. § 25–9–307. Thus, the defendant may not be excused from the consequences of its failure to take ordinary business precaution to determine that farm products were not subject to an outstanding security interest. The burden which this places upon defendant is no different or greater than that placed upon buyers of all farm products in the many states which have adopted the Uniform Commercial Code. Moreover, if the law should entertain defendant's plea for special consideration, it would defeat the salutary policy of financing farmers upon their farm products which, by their nature, are chattels easily removable to distant places.

■ The second defense urged, namely: that plaintiff is barred from its present conversion suit because of laches or some other equitable reason, rests altogether upon factual assumptions for which defendant has not tendered any evidentiary material. In this respect, the affidavit of FHA's County Supervisor Howell, who was personally familiar with the facts, must be accepted as true, since defendant did not submit a contravening affidavit. Morris v. Prefabrication Engineering Co., 181 F.2d 23 (5 Cir. 1950). Rule 56(e), F.R.Civ.P. To raise factual issues, the defendant at this juncture may rely upon neither its pleading nor statements of counsel in its brief. The evidentiary material discloses without dispute that there is no security remaining, apart from the conversion claim. The work mule died in 1968, and its carcass destroyed. The two brood sows and the boar were slaughtered for family food in 1968 and 1969, as permitted by FHA regulations. Also, no real prospect has ever existed for collecting the debt from either the bankrupt estate or the decedent's estate of Robert Patterson, or Maybell Patterson.

■ The essential facts are that the FHA officials made periodic inspections of the chickens on the Patterson farm and as soon as they discovered the unauthorized sale, they made demand against all parties concerned, the defendant being notified of plaintiff's claim on the very day of the discovery. It is settled law that to constitute laches, there must be inexcusable delay by one party and clear prejudice to the other party from such delay. United States v. Alex Dussel Iron Works, 31 F.2d 535 (5 Cir. 1929). Neither requisite element of the doctrine is here present, even if laches may be invoked against the United States suing in a private or proprietary capacity. See Am.Jur.2d, Equity, § 156, p. 691.

■ Finally, it is no defense to assert that plaintiff had to exhaust all other remedies as a prerequisite for bringing its conversion suit against defendant. First, the evidence shows that it would have been an exercise in futility for FHA, after ascertaining the true state of financial affairs of Robert Patterson and his widow, to have reduced its debt to judgment against them. FHA officials were thus justified, absent some evidence of collectibility, in not proceeding with suit against the borrowers, and complied with applicable regulations. § 105.3 of the Federal Claim's Collection Standards, 31 F.R. 13381, 32 F.R. 2805 issued pursuant to the Federal Claims Collection Act of 1966, 31 U.S.C. §§ 951–953. Second and more importantly, the law does not impose upon the secured creditor a legal duty to proceed against the debtor as a prerequisite to suit against a converter. United States v. Matthews, 244 F.2d 626 (9 Cir. 1957); Bank of Havelock v. Western Union Telegraph Co., 141 F.2d 522 (8 Cir. 1905); 15 Am.Jur.2d, Chattel Mortgages, § 181, p. 349. In construing the liability of a converter of FHA chattel security, the court in United States v. Matthews, supra, stated:

"In their brief, the appellees repeatedly insist that 'Wheaton's debt * * * could have been satisfied out of Wheaton's remaining personal property subject to the mortgage.' They assert that 'Not unless and until the Government shall have foreclosed its mortgage and actually sustained some loss after realizing on its remaining secu-

rity, should any thought be given to holding Appellees for any damages resulting to the Government from the sales * * * involved herein.'

"In making these statements the appellees have fallen into serious error. The mortgagee need not first establish that, like a honey-bee, he has flitted from security flower to security flower, and still has not been able to collect sufficient property pollen to satisfy his hunger."

The above holding is reinforced by the provisions of N.C.G.S. § 25-9-306(1) which specify, without qualification, that a secured interest, once perfected, continues in the collateral notwithstanding its sale, exchange or other disposition by the debtor. In our view, this necessarily negates any requirement that the secured party must proceed against the debtor to ripen the converter's liability.

For the foregoing reasons we sustain plaintiff's motion for summary judgment in its favor and enter judgment for the plaintiff for $2,487.50 together with 6% per annum interest from November 27, 1969, the date of conversion.